UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

EARL CONRAD BRAMBLETT,

*Petitioner-Appellant,*

v.

PAGE TRUE, Warden, Sussex I State
Prison,

*Respondent-Appellee.*

No. 02-3

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
James C. Turk, District Judge.
(CA-00-875-7)

Argued: October 29, 2002

Decided: January 8, 2003

Before WILKINS, MICHAEL, and TRAXLER, Circuit Judges.

Affirmed in part and dismissed in part by unpublished opinion. Judge
Wilkins wrote the majority opinion, in which Judge Traxler joined.
Judge Michael wrote a dissenting opinion.

## COUNSEL

**ARGUED:** Jennifer Leigh Givens, VIRGINIA CAPITAL REPRE-
SENTATION RESOURCE CENTER, Charlottesville, Virginia, for
Appellant. Robert Quentin Harris, Assistant Attorney General,
OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for
Appellee. **ON BRIEF:** William H. Lindsey, LAW OFFICES OF

WILLIAM H. LINDSEY, P.C., Salem, Virginia, for Appellant. Jerry W. Kilgore, Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

WILKINS, Circuit Judge:

Earl Conrad Bramblett appeals an order of the district court denying his petition for a writ of habeas corpus,[1] *see* 28 U.S.C.A. § 2254 (West 1994 & Supp. 2002). Bramblett was convicted of various charges, including one count of capital murder, in connection with the deaths of Blaine and Theresa Hodges and their daughters, eleven-year-old Winter and three-year-old Anah. Bramblett was sentenced to death on the capital murder conviction and to terms of imprisonment on the remaining convictions. Because at least one judge of the panel has concluded that Bramblett "has made a substantial showing of the denial of a constitutional right," 28 U.S.C.A. § 2253(c)(2) (West Supp. 2002), with respect to Bramblett's claim under *Napue v. Illinois*, 360 U.S. 264 (1959), we grant a certificate of appealability as to that claim, *see* 28 U.S.C.A. § 2253(c)(3) (West Supp. 2002); 4th Cir. R. 22(a). However, we affirm the ruling of the district court that Bramblett failed to establish cause and prejudice to excuse the default of the *Napue* claim. We deny a certificate of appealability as to the other issues raised by Bramblett.

I.

At approximately 4:50 a.m. on Monday, August 29, 1994, a pas-

---

[1]Bramblett named Page True, Warden of Sussex I State Prison, as Respondent in his petition. We refer to True as "the State" throughout this opinion.

serby noticed smoke rising from the Hodgeses' home in Vinton, Virginia and contacted authorities. Upon entering the home, firefighters found Theresa's badly burned body in the living room; it was later determined that she had been strangled before a flammable liquid was poured on her and ignited. The bodies of Blaine, Winter, and Anah, all of whom were killed with gunshots to the head, were found upstairs. Examination of the bodies indicated that Blaine died between 2:30 a.m. and 2:30 p.m. on August 28, while Theresa and the children were killed no more than two hours before the fire was discovered on August 29. Investigators also determined that the fire was the product of arson. Bramblett, a close friend of the Hodges family, was arrested and charged with the murders and related offenses in 1996.

### A. *Evidence Against Bramblett*

Although the case against Bramblett was almost entirely circumstantial, it was no less powerful for being so. Because the weight of this evidence is relevant to several of Bramblett's claims, we will examine the evidence in some detail.

Testimony from various witnesses established that Bramblett was at the Hodgeses' home during the weekend of August 27-28. And, Bramblett was seen with Theresa, Winter, and Anah as late as 4:00 p.m. on Sunday.

At approximately 4:30 a.m. on August 29—shortly before the fire was discovered—Dorothy McGee drove past the Hodgeses' home. As she proceeded down the road, she was passed by a "pinkish red" pickup truck with a "dark" tailgate. J.A. 358-59. The truck was driven by a lone, white male. Subsequently, law enforcement officers showed McGee a white truck and a red truck under lighting conditions similar to those present at the time of the murders; under those conditions, McGee thought the white truck looked pink. Other evidence established that Bramblett, who is white, drove a white pickup with a dark tailgate at the time of the murders.

Later on the morning of August 29, a neighbor of the Hodges family saw Bramblett drive by the Hodgeses' home, which at that time

was still surrounded by firefighters and law enforcement officials. Bramblett looked over but did not stop.

Fred Smith, a coworker of Bramblett's at Brewco Sign Company, testified that Bramblett sometimes slept in his truck and that he usually parked the truck in front of Brewco on such occasions. Smith further testified that when he arrived at Brewco at 4:30 a.m. on August 29, he did not see Bramblett's truck. At approximately 5:00 a.m., however, Bramblett asked Smith to let him into the building, and he told Smith that he had spent the night in his truck. Smith noticed that Bramblett was wearing clean clothes and was freshly shaven.[2]

Later during the week of the murders, Smith and another coworker observed Bramblett sitting near a dumpster behind Brewco. A subsequent search of the dumpster revealed bills addressed to Bramblett, a t-shirt identical to one given to Winter a few days before the murders, a multi-page document written by Bramblett detailing his belief that Winter was sexually attracted to him, and several audiotapes and a tape recorder. The recordings on the tapes were by Bramblett, and in them he spoke about his obsession with Winter.[3] Also found in the dumpster was a crude sketch depicting the murders. The sketch was of four stick figures: a male, a female, and two children. Lines were drawn to the heads of the male stick figure and the children, and a circle had been drawn around the female and the children, excluding the male. The paper on which the sketch appeared bore notes in Bramblett's handwriting. Other evidence indicated that these notes were written several days before the murders.

Physical evidence from the crime scene was also linked to Bramblett. A pubic hair discovered in the bed where the children's bodies were found was matched to Bramblett through visual, microscopic, and DNA analysis. Several days after the murders, coworkers of Bramblett's found a pair of jeans in a bucket filled with water and a

---

[2]In addition, law enforcement officers who interviewed Bramblett later that day noticed that Bramblett's sneakers appeared to have been freshly laundered.

[3]Similar recordings were found in a box Bramblett sent to one of his sisters for safekeeping. Also in the box was one member of a pair of distinctive socks that belonged to Winter.

solvent used in silk screening in an area of the Brewco shop where Bramblett did silk screening work. Chemical analysis revealed traces of fuel oil on the jeans; fuel oil was one of the accelerants used in the arson of the Hodgeses' home. Additionally, five-gallon fuel cans found at the Hodgeses' home were matched to fuel cans owned by Candler Oil, where Bramblett had worked.

Several individuals who stopped by the Hodgeses' home during the afternoon and evening of Sunday, August 28, and some of the fire-fighters initially on the scene the following morning, observed notes on the front and back door of the home. These notes indicated that there had been a family emergency, although other family members testified that they knew of no such emergency and that Theresa would surely have called them if anything were wrong. Additionally, although family members recognized Theresa's handwriting, the prosecution's document expert, Gordon Menzies, was unable to make a positive match. The prosecution argued, based on other testimony by Menzies, that Menzies was unable to positively identify Theresa's handwriting because she had been under some kind of duress or stress when she wrote the notes. In addition, Menzies found an indented writing[4] on one of the notes and testified that the writing, which was addressed to Bramblett's sons, was very likely written by Bramblett.

The prosecution also linked Bramblett to the crime through ballistics evidence. A .22 magnum revolver that was missing its barrel was recovered from the bedroom where Blaine's body was found; police also seized bullets and shell casings from the crime scene. Searches of Bramblett's truck and a storage warehouse he rented yielded additional .22 magnum bullets, shell casings, and unfired cartridges. Expert analysis indicated that all of the shell casings bore markings from a revolver like the one found at the crime scene. Additionally, the prosecution's expert determined with certainty that a shell casing found in Bramblett's truck had been fired from the revolver found near Blaine's body.

The prosecution also presented evidence of suspicious statements by Bramblett. Having been informed of Bramblett's close relationship

---

[4]An indented writing is the impression left on a piece of paper that is beneath another piece of paper being written on.

with the family, law enforcement officials sought to speak with him at the outset of their investigation. Sergeant Mark Vaught with the Vinton Police Department spoke with Bramblett at approximately 5:00 p.m. on August 29. Vaught informed Bramblett that the Hodges family had been killed in a fire; he did not mention that the Hodgeses had been murdered. Vaught subsequently introduced Bramblett to Agent Barry Keesee with the state police. Keesee again informed Bramblett that the Hodgeses had been killed in a fire, and asked Bramblett when he had last seen Blaine. Although several witnesses testified to seeing Bramblett at the Hodgeses' home over the weekend, Bramblett stated that he could not remember when he had last seen Blaine.[5] Bramblett then appeared to become angry and said, "The sorry [expletive] had a beautiful family. He did them and did himself."[6] Trial Tr., Vol. 11, at 104 (internal quotation marks omitted). Bramblett then asked, "They were murdered, weren't they?" *Id.* at 106 (internal quotation marks omitted). This was not the only time that Bramblett revealed knowledge of the crimes beyond information available to the public. Shortly after his arrest in 1996, Bramblett met with a reporter. During the interview, Bramblett made statements concerning the facts of the crime—specifically, that only Theresa had been doused with gasoline—that had not been released by the police.

Shortly after the murders, Bramblett left Virginia for Spartanburg, South Carolina, where he lived until he was arrested in 1996. During that time, Bramblett told his roommate, James Lee Owens, that he had done "something bad" in Virginia but that he couldn't talk about it. Trial Tr., Vol. 7, at 15 (internal quotation marks omitted).

---

[5]Later that day, Bramblett told another officer that he could not remember whether he had been at the Hodgeses' home on Sunday, August 28. Several days after the murders, Blaine's brother spoke with Bramblett about the murders, and Bramblett was evasive regarding his activities on August 28.

[6]Based on the locations of the bodies and the fact that a firearm was found near Blaine's body, police initially believed that the deaths were the result of a murder/suicide in which Blaine had killed his family, set fire to the home, then killed himself. Immediately prior to speaking with Bramblett, however, Agent Keesee had learned that Blaine died many hours before the rest of the family, rendering the murder/suicide theory untenable.

The prosecution's last witness was Tracy Turner, who was incarcerated with Bramblett prior to Bramblett's trial. Turner testified that Bramblett said he was "addicted to young girls" and that he had choked Theresa after she had "caught" him with Winter. J.A. 460. According to Turner, Bramblett further stated that after strangling Theresa he went upstairs and "took care of his business" with the remaining members of the Hodges family.[7] *Id.* at 461. Bramblett also told Turner that he had set fire to the Hodgeses' home in order to destroy the evidence.

## B.  *Procedural History*

On direct review, the Supreme Court of Virginia affirmed Bramblett's convictions and sentences. The court rejected, *inter alia*, Bramblett's assertion that the trial court erred in finding him competent to stand trial. *See Bramblett v. Commonwealth*, 513 S.E.2d 400, 406-07 (Va.), *cert. denied*, 528 U.S. 952 (1999). Bramblett then sought state habeas relief, alleging, as is relevant here, that trial counsel were constitutionally defective in numerous respects; that the State withheld materially exculpatory information; that the State knowingly presented perjured testimony; and that the State violated his Sixth Amendment right to counsel. The Supreme Court of Virginia rejected the ineffective assistance claims on the merits and determined that the remaining claims were procedurally defaulted by virtue of Bramblett's failure to raise them on direct appeal, *see Slayton v. Parrigan*, 205 S.E.2d 680, 682 (Va. 1974).

Bramblett filed this federal habeas action in April 2001. The district court granted the State's motion to dismiss, determining first that the state court decisions regarding the competency claim and the ineffective assistance of counsel claims raised in the state habeas proceedings did not meet the standards set forth in 28 U.S.C.A. § 2254(d) for the granting of federal habeas relief. The court also determined that Bramblett had failed to establish cause and prejudice or a miscarriage of justice to excuse the default of his remaining claims. Finally, the

---

[7]Turner's testimony regarding Bramblett's statements is thus inconsistent with the medical evidence indicating that Blaine Hodges died many hours before the rest of the Hodges family.

district court denied an evidentiary hearing. Bramblett appeals all of these rulings.

## II.

Bramblett first contends that the district court erred in rejecting his claim that he was incompetent to stand trial. It is well settled that a state violates the Due Process Clause of the Fourteenth Amendment when it tries an incompetent defendant. *See, e.g.*, *Medina v. California*, 505 U.S. 437, 439 (1992). In determining competency, the question for the trial court is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam) (internal quotation marks omitted); *see Burket v. Angelone*, 208 F.3d 172, 191 (4th Cir. 2000) (applying *Dusky* standard in federal habeas proceeding).

> Not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges. Likewise, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial.

*Burket*, 208 F.3d at 192 (internal quotation marks & citation omitted).

Three psychologists testified at Bramblett's competency hearing. Dr. Evan Nelson diagnosed Bramblett as suffering from a delusional disorder (a form of psychosis) of a persecutory type. Bramblett's delusion, which existed long before the murders, was his irrational belief that he was the object of a conspiracy to frame him for a crime.[8] Dr. Nelson testified that Bramblett had incorporated his defense attorneys into the delusion, believing them to be part of the plot to kill

---

[8]Parts of this delusion specifically related to the Hodges family. In audio tapes and letters created well before the murders, Bramblett expressed his belief that Blaine Hodges was part of the conspiracy and that Blaine was using Winter as part of a plan to entrap Bramblett for a sexual crime.

him. Dr. Nelson concluded that Bramblett was not competent because, while he had a rational understanding of the criminal process and role of the defense attorney *in general*, he did not have a rational understanding of the role of defense counsel *in his case*.

The two other psychologists, Dr. Joseph Leizer and Dr. Lee Hagan, testified that Bramblett was competent to stand trial despite his psychosis. Dr. Leizer, like Dr. Nelson, diagnosed Bramblett as suffering from a delusional disorder of the persecutory type, but he concluded that Bramblett had not included his defense attorneys in his delusion. Rather, Dr. Leizer believed that Bramblett had considered and rejected the idea that his attorneys might be colluding against him. Dr. Hagan agreed with Drs. Nelson and Leizer that Bramblett was delusional but nevertheless found him to be "highly" competent. J.A. 246.

After hearing the testimony and reviewing various documents and audio tapes created by Bramblett, the trial court found that Bramblett was competent to stand trial. In particular, the court found that Bramblett was intelligent, understood the proceedings against him, and was able to assist his counsel in the preparation of his defense. On appeal, the Supreme Court of Virginia affirmed, concluding that the finding of competency by the trial court was "fully supported by the record." *Bramblett*, 513 S.E.2d at 407.

The question of competency to stand trial is a factual one. *See Maggio v. Fulford*, 462 U.S. 111, 117 (1983) (per curiam). Section 2254 contains two provisions relevant to the evaluation, on federal habeas, of state-court factual determinations. First, § 2254(d)(2) provides that a district court may not grant habeas relief unless the adjudication of a claim by the state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Second, § 2254(e)(1) provides that factual findings by the state court are presumed to be correct and that the petitioner bears the burden of "rebutting the presumption of correctness by clear and convincing evidence." We need not here determine the contours of the relationship between § 2254(d)(2) and § 2254(e)(1), because Bramblett cannot show either that the state court finding of competency was unreasonable in light of the evidence presented or that it was incorrect.

First, Bramblett cannot demonstrate that the determination of competency by the state trial court was unreasonable in light of the evidence presented at the competency hearing. Bramblett primarily argues that any finding of competency was unreasonable in light of Dr. Nelson's testimony that Bramblett believed his defense attorneys to be part of the conspiracy against him. However, the other two psychologists testified regarding their reasons for disagreeing with Dr. Nelson's views. Dr. Leizer, in particular, discussed at length his reasons for concluding that Bramblett's delusions did not render him incapable of rationally understanding the role of his defense attorneys.

Bramblett also contends that it was unreasonable for the trial court to accept Dr. Leizer's testimony that Bramblett could "set aside" his delusion that defense counsel were conspiring against him because delusions, by definition, are fixed beliefs that cannot be set aside despite all rational evidence to the contrary. This argument rests on an inaccurate account of Dr. Leizer's testimony. Dr. Leizer testified not that Bramblett had a delusional belief that he could somehow "set aside," but rather that while Bramblett had entertained the possibility that counsel were against him, he had rejected the notion, and it had not become part of his delusion.

Bramblett has also failed to rebut the presumption of correctness by clear and convincing evidence. Bramblett presented to the district court a letter from Dr. Nelson (submitted to defense counsel after the competency hearing) and an affidavit from David Williams, defense counsel's investigator. In the letter, Dr. Nelson reiterated his view that Bramblett was incompetent to stand trial, noting that this belief was bolstered by Bramblett's "litany of complaints" about the conduct of defense counsel and his suggestion that counsel were withholding evidence from him. J.A. 11. The Williams affidavit stated, in relevant part, that

> the preparation of Bramblett's defense . . . was significantly impaired by Bramblett's mental illness. . . . Although Bramblett was able to communicate with myself and Counsel, all communication was in the context of his encapsulated delusional thought process. I was unable to communicate with Bramblett on any level without that communication coming through the prism of his mental illness and this placed both

> myself and trial Counsel in the position of attempting to gauge reality from delusion in dealing with Bramblett.

*Id.* at 28.

Bramblett argues that the Nelson letter and the Williams affidavit constitute clear and convincing evidence that the competency determination of the state court was incorrect. We disagree. The Nelson letter is primarily a repetition of the view expressed by Dr. Nelson at the competency hearing. Bramblett's post-hearing statement to Dr. Nelson that defense counsel were withholding information does provide additional support for Dr. Nelson's belief that Bramblett was not competent, but it is not "clear and convincing" evidence that the competency determination was incorrect. And, while the Williams affidavit indicates that Bramblett's delusional disorder made it more difficult to represent him, the affidavit does not establish that Bramblett lacked a rational understanding of the proceedings or that he was unable to assist defense counsel.

### III.

Bramblett next maintains that trial counsel were constitutionally deficient in several respects. In order to establish that his constitutional right to the effective assistance of counsel was violated, Bramblett must demonstrate that his attorneys' "representation fell below an objective standard of reasonableness" and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Because the Supreme Court of Virginia rejected Bramblett's claims of ineffective assistance of counsel on the merits, habeas relief is warranted only if Bramblett can demonstrate that the adjudication of his claims by the state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1).

#### A.  *Competency Hearing*

Bramblett first contends that trial counsel were ineffective for failing to offer testimony at the competency hearing from David Wil-

liams regarding the difficulty Williams faced in investigating the case. Even if it was objectively unreasonable for counsel to fail to offer this testimony, the testimony is not so significant that there is a reasonable probability that its presentation would have altered the outcome of the competency proceeding. In this regard, it should be noted that Williams is not a psychologist. His *perceptions* of Bramblett's mental functioning were thus entitled to less weight than the informed opinions of the psychologists who examined Bramblett.

## B.  *Ballistics Evidence*

As noted above, the prosecution used expert testimony to connect a .22 magnum revolver found at the crime scene to bullets and shell casings found in Bramblett's possession. Bramblett maintains that counsel were ineffective for failing to seek the appointment of defense experts to confirm or contradict the conclusions of the prosecution's experts.

Because trial counsel could not have demonstrated an entitlement to the appointment of an expert, Bramblett cannot establish that counsel were constitutionally deficient for failing to make a request. Under Virginia law, which is congruent with the requirements of the federal Constitution, an indigent defendant is entitled to "'the basic tools of an adequate defense,'" which may sometimes include appointed experts. *Husske v. Commonwealth*, 476 S.E.2d 920, 925 (Va. 1996) (quoting *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985)). Virginia does not appoint experts whenever requested, however. Rather, an indigent defendant bears the burden of demonstrating that the appointment of an expert "would materially assist him in the preparation of his defense and that the denial of such services would result in a fundamentally unfair trial." *Id.* Importantly, "[m]ere hope or suspicion that favorable evidence is available" is not sufficient. *Id.* (internal quotation marks omitted). Because Bramblett offers only bare allegations and speculation to support his claim, he has failed to make the showing necessary to establish entitlement to the appointment of an expert.[9]

---

[9]Bramblett maintains that his inability to demonstrate his need for expert assistance is the result of the refusal of the district court to appoint an expert to assist him in developing such evidence. However, to accept this argument would be to relieve Bramblett of the burden of making any showing that expert assistance was necessary to assist in the preparation of his defense.

## C.  *Video Reenactment*

During the course of Dorothy McGee's testimony, the prosecution entered into evidence a video reenactment of McGee's experience with the "pinkish red" truck. In the reenactment, McGee drove her vehicle down the same stretch of road under lighting conditions similar to those on August 29, and was passed by a police officer driving a white truck. McGee testified that the truck in the reenactment looked "[s]ort of pink . . . the way it looked that night." J.A. 364. McGee further testified that, in view of the re-enactment, she was "certain that the truck that passed [her] was white with a dark tailgate." *Id.* at 365-66.

Bramblett claims that trial counsel were ineffective for failing to object to the admission of the video reenactment on the basis that the prosecution failed to lay a proper foundation by eliciting testimony from McGee regarding the similarity of conditions during the reenactment to the conditions on the morning of August 29.[10] We conclude that any objection would have been futile. *See Oken v. Corcoran*, 220 F.3d 259, 269-70 (4th Cir. 2000) (holding that trial counsel were not ineffective for failing to make futile objection). While the videotape was played for the jury, McGee testified regarding the similarity of the events in the video to her experience on the morning of August 29. In light of McGee's testimony, it is highly doubtful that the State would have been unable to lay the necessary foundation for admission of the video, and Bramblett has failed to demonstrate that a proper foundation could not have been laid.[11] *Cf. Brown v. Corbin*, 423 S.E.2d 176, 178 (Va. 1992) (stating that a photographic reconstruction of an event is admissible if the party offering the evidence establishes that the reconstruction "is substantially similar, although not

---

[10]Bramblett challenged the admissibility of the video on direct appeal, but the Supreme Court of Virginia found that the challenge was barred under the State's contemporaneous objection rule. *See Bramblett*, 513 S.E.2d at 405 n.*.

[11]Bramblett contends that it was the State's burden to establish the admissibility of the video reenactment. On habeas review, however, the burden rests with the petitioner to demonstrate that counsel's performance was prejudicially ineffective. *See Savino v. Murray*, 82 F.3d 593, 598-99 (4th Cir. 1996).

necessarily identical, to the actual event in all of its essential particulars").

Even assuming that counsel were ineffective for failing to object to the admission of the videotape, Bramblett cannot establish that he was prejudiced. Contrary to Bramblett's assertion, the video reenactment was not so critical to the prosecution's case that there is a reasonable probability that the jury would not have found Bramblett guilty had it been excluded. As noted above, substantial evidence tied Bramblett to the murders. In light of this evidence, it was not unreasonable for the Supreme Court of Virginia to reject this claim.

## D.  *Penalty Phase*

Bramblett's last claim of ineffective assistance of counsel concerns the mitigation case presented during the penalty phase. Bramblett contends that counsel should have had Dr. Nelson testify regarding Bramblett's psychosis. We conclude that it was not objectively unreasonable for counsel not to offer such testimony.

During the sentencing phase, Bramblett's attorneys presented testimony from various people—including Bramblett's eldest sister, his oldest brother, his ex-wife, and his son—that touched on Bramblett's paranoia. All of these witnesses testified, in brief, that Bramblett believed that the police were plotting against him. One witness who was familiar with Bramblett's history of alcoholism testified that Bramblett's paranoia was worse when he consumed alcohol. During closing arguments, counsel asserted that Bramblett suffered from mental illness, that the murders were the result of Bramblett's mental illness, and that Bramblett should be spared the death penalty because he was mentally ill. In response, the State argued that, instead of being a mitigating factor, any mental illness suffered by Bramblett made him a continuing danger to others: "I submit to you, ladies and gentlemen, do you think he is cured now? Do you think he has got it out of his system because he has killed four people? Do you think that issue is gone?" Trial Tr., Vol. 16, at 81.

Even if counsel were ineffective for failing to present further evidence regarding Bramblett's mental illness, there is no reasonable probability that Bramblett suffered prejudice. Here, "further evidence"

would have consisted of testimony from Dr. Nelson regarding Bram-blett's delusions of persecution. Such testimony, we know from Nelson's testimony at the competency hearing, would have included statements that delusions are very firmly held even in the face of rational evidence to the contrary, *see* J.A. 139 ("You can argue until you are blue in the face and these [delusional] people will not change their mind[s]."); that "[d]elusional disorder is a hard disorder to treat," *id.* at 155; and that new people could be incorporated into the delusion, *see id.* at 170. The danger in allowing such evidence to be presented to a capital sentencing jury considering the issue of the defendant's future dangerousness is obvious. As the Seventh Circuit has explained, "jurors may not be impressed with the idea that to know the cause of viciousness is to excuse it; they may conclude instead that, when violent behavior appears to be outside the defendant's power of control, capital punishment is appropriate to incapacitate." *Burris v. Parke*, 116 F.3d 256, 260 (7th Cir. 1997); *see Penry v. Lynaugh*, 492 U.S. 302, 324 (1989) (characterizing evidence of mental retardation as "a two-edged sword" that "may diminish [the defendant's] blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future").

## IV.

We now turn to Bramblett's defaulted claims. Absent cause and prejudice, a federal habeas court may not review constitutional claims when a state court has declined to consider their merits on the basis of an adequate and independent state procedural rule.[12] *See Harris v.*

---

[12] A procedural default also may be excused if the petitioner demonstrates that "failure to consider the claim[ ] will result in a fundamental miscarriage of justice," *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), *i.e.*, that "a constitutional violation has probably resulted in the conviction of one who is actually innocent," *Murray v. Carrier*, 477 U.S. 478, 496 (1986). In order to make this showing, a federal habeas petitioner must present new "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Schlup v. Delo*, 513 U.S. 298, 316 (1995). Bramblett rests his claim of actual innocence solely on Turner's claim to have perjured himself at trial. For the reasons discussed below, Turner's testimony did not carry such

*Reed*, 489 U.S. 255, 262 (1989). In order to demonstrate cause, the petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Additionally, the petitioner must demonstrate actual prejudice.[13] *See Mickens v. Taylor*, 240 F.3d 348, 356 (4th Cir. 2001) (en banc), *aff'd*, 122 S. Ct. 1237 (2002).

## A.    *Claims under* Brady v. Maryland

Suppression by the government of evidence favorable to the defense that is material to the outcome of a trial or sentencing proceeding violates due process, irrespective of the motive of the prosecutor. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). In addition to the disclosure of materially exculpatory evidence, due process requires the government to disclose material evidence affecting the credibility of prosecution witnesses. *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972). Undisclosed evidence is material when its cumulative effect is such that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (internal quotation marks omitted); *see id.* at 436-37 (explaining that "suppressed evidence [must be] considered collectively, not item by item"). A "reasonable probability" is one sufficient to undermine confidence in the outcome. *Id.* at 434 (internal quotation marks omitted). Evidence that does not meet the prejudice threshold

---

weight that it is more likely than not that no reasonable juror with knowledge of Turner's perjury would have convicted Bramblett. *See id.* at 327.

Additionally, we note that with respect to virtually every defaulted claim, Bramblett argues that the district court applied the wrong standard in determining prejudice. Because this court reviews the ruling of the district court de novo, effectively standing in its shoes to consider the issues anew, such errors, even if they occurred, do not warrant reversal.

[13]There is some dispute between the parties regarding the nature of the showing required to demonstrate actual prejudice. For purposes of this appeal, we will assume that Bramblett is correct that the standard for "actual prejudice" is the prejudice standard from the underlying constitutional claim.

for a *Brady* claim necessarily fails to satisfy the prejudice prong of procedural default analysis. *See Strickler v. Greene*, 527 U.S. 263, 282 (1999).

### 1.   *Tracy Turner*

Turner testified that Bramblett made several incriminating statements about the Hodges murders. These statements came to light during a series of meetings between Turner and Agent Barry Keesee of the Virginia State Police. During state habeas proceedings, the State for the first time disclosed notes that Agent Keesee had taken of his first conversation with Turner. Bramblett claims that these notes were materially exculpatory and should have been disclosed prior to trial. Bramblett also contends, based on a post-trial affidavit by Turner, that an agreement existed between Turner and the State regarding the benefits Turner would obtain by testifying against Bramblett.[14]

Even if Bramblett can establish cause to excuse his default of this claim, there is no "reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Id.* at 289 (internal quotation marks omitted). The Keesee notes pertain to incriminating statements made to Turner by Bramblett, and are thus not exculpatory—much less materially so —in and of themselves. And, while Bramblett maintains that the notes are valuable for impeachment purposes because there are inconsistencies between the Keesee notes, Turner's testimony, and Turner's notes, he fails to explain what these inconsistencies are and how they are material to the issue of guilt or innocence. Further, the alleged agreement between Turner and the State—assuming for purposes of decision that it actually existed—is not material in light of the weakness of Turner's testimony. Even without evidence of the agreement, the jury knew that Turner had been convicted of numerous offenses involving dishonesty and that Turner's testimony was inconsistent

---

[14]Additionally, Bramblett complains that the State did not timely disclose Turner's criminal history, transcripts of taped conversations between Turner and Agent Keesee, and Turner's notes of his conversations with Bramblett. However, the record establishes—and Bramblett does not dispute—that counsel received these materials in time to use them at trial. That is all that *Brady* requires.

with the medical evidence regarding the order in which the Hodgeses were killed. And, on cross-examination defense counsel raised the possibility that Turner was testifying against Bramblett in hopes of regaining his status as a prison trustee. Although this attack would certainly have carried more weight if counsel had known about the existence of an agreement between Turner and the State, there is no reasonable probability that such additional weight would have persuaded the jury to reach a different result.

### 2. *Michael Fulcher*

Michael Fulcher is Theresa Hodges' half-brother. Fulcher, a drug dealer, worked as an informant for the Drug Enforcement Administration (DEA) during the 1980s and continued to offer information to the DEA after his incarceration in 1991. At trial, Bramblett argued that the Hodgeses were killed in retaliation for Fulcher's activities.

In his state habeas petition, Bramblett claimed that the State had withheld materially exculpatory information regarding Fulcher. In support of this claim, Bramblett submitted an affidavit from defense investigator David Williams, who claimed that subsequent to trial he had learned that: (1) the Virginia State Police were investigating Fulcher for drug dealing and money laundering (crimes of which he was later convicted) contemporaneously with the investigation of the Hodges murders; and (2) Fulcher, who was incarcerated, was placed in protective segregation "during this time frame." J.A. 28.

Bramblett cannot demonstrate prejudice for his default of this claim because the failure to disclose this information did not violate *Brady*. Even assuming that the facts that Fulcher committed other crimes and that he was segregated *for his own protection* support Bramblett's theory that the Hodgeses were killed in retaliation for Fulcher's activities as an informant, this evidence is clearly not material to Bramblett's guilt or innocence. Simply put, Bramblett offers nothing more than the barest speculation to connect Fulcher's activities to the murders.

### 3. *Benjamin Carr*

For the first time in his federal habeas petition, Bramblett claimed that the State withheld information regarding the possible involve-

ment of Benjamin Carr in the murders. In support of this claim, Bramblett submitted affidavits from Robert and Judith Stinnett, longtime friends of Carr's. According to Judith's affidavit, Carr contacted her "in 1995 or 1996" and "offered to 'ice [Robert's former employer] like the family on Virginia Avenue.'" J.A. 36, 37. Judith took this statement to mean that Carr claimed responsibility for the Hodges murders; she made this connection because Carr had told her that he had had an argument with Blaine Hodges during a period when both worked for the post office. Judith mentioned her conversation with Carr to a friend who was a Vinton Police officer.

On the assumption that Carr's statement to Judith was exculpatory, the State's failure to disclose it constitutes cause for Bramblett's default of this claim.[15] There was no prejudice, however. Carr's statement is, at best, equivocal, and is thus inculpatory of himself (and exculpatory of Bramblett) only by inference. In light of the strong evidence against Bramblett, it is highly unlikely that any reasonable jury would draw such an inference, much less use it as a basis to acquit Bramblett. *Cf. Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that, in light of "overwhelming" case against defendant, *Brady* violation could not be established by mere supposition).[16]

### 4.   *Cumulative Materiality*

Finally, Bramblett argues that even if he has failed to establish that any of the individual pieces of withheld evidence is material, materiality is present when the individual pieces are viewed cumulatively. *See Kyles*, 514 U.S. at 436-37 (explaining that assessment of material-

---

[15]Neither Judith's interpretation of the statement, nor her further speculation that Carr was capable of murdering children, is admissible; hence, it is not subject to disclosure under *Brady*. *See Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (per curiam) (holding that inadmissible materials that are not likely to lead to the discovery of admissible exculpatory evidence are not subject to disclosure under *Brady*).

[16]Bramblett also maintains that timely disclosure of the information from Judith Stinnett could have led to further exculpatory information. This claim rests on little more than speculation, however, and there is no basis on which we can conclude that further investigation would have led to materially exculpatory information.

ity under *Brady* requires that evidence be "considered collectively, not item by item"). To the contrary, even when viewed collectively, the suppressed items—none of which is related to the others—do not place the evidence actually presented at trial in such a different light as to undermine confidence in the verdict.

### B.   *Claim under* Napue v. Illinois

A conviction acquired through the knowing use of perjured testimony by the prosecution violates due process. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959). The knowing use of perjured testimony constitutes a due process violation when "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Kyles*, 514 U.S. at 433 n.7 (internal quotation marks omitted).

Bramblett maintains that the State knowingly presented false testimony from Tracy Turner. In support of this claim, Bramblett points to a lengthy affidavit by Turner in which Turner claimed to have fabricated his testimony against Bramblett with the aid of Agent Keesee during a series of meetings between the two. According to the affidavit, Bramblett never said anything incriminating during his conversations with Turner. Rather, Agent Keesee provided Turner with information gleaned from the investigation, which Turner would then incorporate into his recounting of innocent conversations with Bramblett.

Even assuming that Turner's testimony was entirely fabricated and that the State knew this at trial, Bramblett suffered no prejudice. The most damaging portions of Turner's brief testimony were his claims that Bramblett stated that he was "addicted to young girls" and that he had "choked the life out of" Theresa Hodges, then "went . . . to the man's room and then . . . went to the girls' room and . . . finished the business, took care of . . . business." J.A. 460-61. The first of these statements was cumulative of substantial other evidence regarding Bramblett's fixation with Winter Hodges—some of it from Bramblett himself, in the form of audio tapes he recorded. The second was of questionable veracity in light of the fact that the order of the murders was inconsistent with the medical evidence, as highlighted by defense counsel on cross examination. Turner's credibility was further called

into question by his numerous convictions for crimes involving dishonesty, his desire to regain his status as a jail trustee, and his possible involvement in a scheme to present false testimony in another criminal proceeding.

It is true, as Bramblett points out, that the prosecutor asserted during closing arguments that if Turner were believed, his testimony alone was sufficient to convict Bramblett. However, it is also true that the vast majority of the prosecutor's lengthy closing argument was devoted to a careful detailing of the circumstantial evidence against Bramblett and that the prosecutor concluded his argument by asserting that even if the jurors disregarded Turner's testimony, the circumstantial evidence was more than sufficient to convict.

In view of the extremely strong circumstantial case against Bramblett and the weakness of Turner's testimony, we simply cannot say that there is a reasonable likelihood that the jury would have acquitted Bramblett had it known that Turner's testimony was wholly false. We therefore conclude that Bramblett has failed to demonstrate prejudice to excuse his default of this claim.

### C.   *Claim under* Massiah v. United States

The state violates the Sixth Amendment when, after the right to counsel has attached and in the absence of counsel, it "deliberately elicit[s]" incriminating statements from the defendant and introduces those statements against him at trial. *Massiah v. United States*, 377 U.S. 201, 206 (1964). Bramblett asserts a *Massiah* claim on the basis of an allegation in Turner's affidavit that Agent Keesee instructed Turner to "keep talking to Bramblett" and report any incriminating statements Bramblett made. J.A. 14; *see United States v. Henry*, 447 U.S. 264, 266, 270-71 (1980) (holding that *Massiah* was violated when law enforcement agent instructed jailhouse informant "to be alert" for any incriminating statements made by defendant "but not to initiate any conversation with or question" defendant because officer "must have known" that informant would take steps to obtain incriminating information).

Bramblett acknowledges that his reliance on Turner's affidavit and his claim that all of the statements therein—*i.e.*, that Turner fabricated

the incriminating statements allegedly made by Bramblett—are true precludes him from making a claim directly under *Massiah*. Nevertheless, he maintains that his Sixth Amendment rights were violated because "Turner's communications with Bramblett provided an otherwise-unknown platform upon which Agent Keesee could build fabrications." Br. of Petitioner-Appellant at 47. This argument suffers from two defects. First, it is simply a rehashing of Bramblett's *Napue* claim, discussed above. Second, this argument is not an application of *Massiah*, but rather is an extension of it, and Bramblett points to no authority clearly establishing such a rule when his conviction became final in October 1999. Hence, the argument is barred by the new rule doctrine set forth in *Teague v. Lane*, 489 U.S. 288 (1989).

## V.

Finally, Bramblett argues that the district court erred in refusing his request for an evidentiary hearing. 28 U.S.C.A. § 2254(e)(2) provides that a habeas petitioner who has "failed to develop the factual basis of a claim in State court" is entitled to an evidentiary hearing only if, as is relevant here: (1) "the claim relies on . . . a factual predicate that could not have been previously discovered through the exercise of due diligence"; and (2) "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the [petitioner] guilty of the underlying offense." The district court correctly concluded that Bramblett could not satisfy the second prong of this test.

## VI.

For the reasons set forth above, we conclude that Bramblett has failed to make a substantial showing of the denial of a constitutional right with respect to the majority of his claims. Accordingly, as to those claims we deny a certificate of appealability and dismiss. With respect to Bramblett's *Napue* claim, we grant a certificate of appealability but affirm the ruling of the district court.

*AFFIRMED IN PART; DISMISSED IN PART*

MICHAEL, Circuit Judge, dissenting:

Tracy Turner, who was in jail with Earl Bramblett, testified at Bramblett's capital murder trial that Bramblett had confessed to murdering the entire Hodges family. Turner's testimony was the only direct evidence against Bramblett, who was convicted and sentenced to death. Turner now swears by affidavit that his testimony about Bramblett's confession was a total lie. According to Turner, he fabricated the confession with the help of a Special Agent of the Virginia State Police, who fed him the known details of the Hodges murders. The majority assumes that Turner's testimony was fabricated, but concludes that Bramblett was not prejudiced because the circumstantial evidence was more than sufficient to convict. The majority also affirms the district court's denial of Bramblett's request for an evidentiary hearing. I respectfully dissent. Turner's testimony about Bramblett's confession could have affected the jury's decision to convict. If the testimony was false as Turner now claims, that would be enough to grant the writ of habeas corpus. I would therefore vacate the order denying the writ and remand the case for an evidentiary hearing to determine whether Turner gave perjured testimony at Bramblett's trial.

## I.

Bramblett's claim that the prosecution violated *Napue v. Illinois*, 360 U.S. 264 (1959), by allowing a state witness to perjure himself, is a form of a *Brady* claim. *See Strickler v. Greene*, 527 U.S. 263, 280-81 (1999); *Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995); *United States v. Agurs*, 427 U.S. 97, 103 (1976).[1] Bramblett's inability to raise the *Napue* issue prior to his state habeas proceeding leaves it procedurally defaulted, and he must show cause and prejudice to prevail at this stage. *See Strickler*, 527 U.S. at 282. I believe he has done

---

[1]Although Bramblett alleges that a police officer, rather than the prosecutors, had actual knowledge of his perjury, the officer's knowledge is imputed to the prosecution. *Boyd v. French*, 147 F.3d 319, 329-30 (4th Cir. 1998); *see also Napue*, 360 U.S. at 269 ("First, it is established that a conviction obtained through use of false evidence, known to be such by *representatives of the State*, must fall under the Fourteenth Amendment.") (emphasis added; internal citations omitted).

both. He has, of course, shown cause. Bramblett was only able to raise this issue once Turner, the confessed perjurer, decided to come clean to Bramblett's state habeas lawyers. Bramblett's default (failing to raise the issue on direct appeal) was due to the prosecution's concealment of its use of the perjured testimony. That excuses the default. *Amadeo v. Zant*, 486 U.S. 214, 222 (1988).

Bramblett has demonstrated prejudice if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Kyles*, 514 U.S. at 433 n.7 (internal quotation marks omitted). Courts view blatant prosecutorial misconduct as serious business, and the prosecution's knowing use of perjured testimony is more apt to be considered prejudicial. *See id.*; *see also Agurs*, 427 U.S. at 103-04; *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (noting that the use of perjury "by a State to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation"). A petitioner asserting a run-of-the-mill *Brady* claim — that the prosecution failed to turn over information that would have been helpful to the defense — must show "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433-34 (internal quotation marks omitted). On the other hand, a petitioner asserting that the prosecution knowingly used perjured testimony need only show "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Kyles*, 514 U.S. at 433 n.7 (internal quotation marks omitted).

The majority concludes that because "the circumstantial evidence was more than sufficient to convict," there is no reasonable likelihood that Turner's perjured testimony could have affected the judgment of the jury. *Ante* at 21. If Turner's affidavit is true, however, it suggests that the police officer went well beyond encouraging misleading or exaggerated testimony and instead fed Turner enough details of the murder investigation to allow him to fabricate a believable confession that he attributed to Bramblett. This allegedly manufactured confession at minimum reinforced the jury's determination of guilt. At worst, it removed justifiable doubts the jury could have had about the strength of the circumstantial evidence. Turner's perjured testimony could therefore have affected the judgment of the jury.

The circumstantial case against Bramblett was fairly strong, but it was far from airtight. If only the circumstantial evidence had been presented, reasonable jurors could have had real doubts about convicting Bramblett. This is because many of the individual pieces of circumstantial evidence could be explained away or at least minimized. *First*. Bramblett drove a white pickup with a dark tailgate, and Dorothy McGee testified that she saw a pink or red pickup with a dark tailgate pass her in the vicinity of the Hodges home in the early morning hours after the murders. *Ante* at 3; J.A. 358-59. The prosecution sought to demonstrate through reenactments that a white truck would have looked pink or red under early morning lighting conditions. J.A. 359-66. Jurors, however, could have reasonably doubted the authenticity of the reenactments or simply could have concluded that the white truck used in the reenactments did not look pink or red. *Second*. The murder weapon was never conclusively identified, and expert testimony that unfired bullets found at the murder scene and among Bramblett's belongings came from the same melt (or lot) appears less important than the prosecution claimed. Jurors could have believed that more than one person in the same town might have gone to the local store and bought ammunition that came from the same lot. *Third*. The only physical evidence linking Bramblett to the crime scene was the single pubic hair, matched to him through DNA, that was discovered in Anah and Winter's bed, where their bodies were found. *Ante* at 4-5; Trial Tr., Vol. 78, at 74-75. Bramblett was a frequent visitor to the Hodges household. Thus, the hair could have been blown into the bed by the large fans used by firefighters or by air coming through an open window. Trial Tr., Vol. 70, at 130, 156-57, 168. This was possible because it does not appear that the bodies were covered immediately to protect the crime scene, Trial Tr., Vol. 70, at 132, 157; and, in any event, at some point in the hours after the fire, the cover was removed for a considerable period of time, Trial Tr. Vol. 73, at 22. *Fourth*. Bramblett's statements to the police that he thought he would be arrested for the murder, made before the police told him the Hodgeses had been murdered, Trial Tr., Vol. 73, at 13-14, are consistent with his delusions that the police were using the Hodges family to entrap him. Trial Tr., Vol. 78, at 98. *Fifth*. Despite the prosecution's argument that Bramblett's obsessions about Winter were the motive for the crime, Trial Tr., Vol. 78, at 97, the prosecution presented no evidence that Winter or her sister was sexually assaulted by Bramblett the night of the murders or on any other occa-

sion. *Sixth*. The prosecution never fully explained how Bramblett could have killed Mr. Hodges several hours before he killed the rest of the family when Bramblett was with Mrs. Hodges and the two girls for several hours between the time Mr. Hodges was murdered and the time the other three were murdered. A witness who saw the group together believed nothing was amiss; Mrs. Hodges even spoke to the witness privately and expressed no concern about her or her family's safety. Trial Tr., Vol. 71, at 185.[2] In sum, without Turner's testimony that Bramblett told him the details of the Hodges murders and ultimately confessed to committing them, the Commonwealth would have been left with only the circumstantial case, a case that was not without some holes.

Moreover, if Turner's current story is true, the degree of deceit practiced by the prosecution raises the question of whether it believed that its circumstantial case was sufficient to prove Bramblett's guilt beyond reasonable doubt. The Commonwealth argues to us that its case against Bramblett was so strong that a fabricated confession would not have affected the jury's assessment. Yet Turner's affidavit, if true, suggests that the Commonwealth believed that it needed to manufacture evidence of incriminating statements by Bramblett to ensure a conviction. An examination of Turner's affidavit and his detailed claims about the prosecution's efforts to engineer his false testimony lends strength to Bramblett's claim that Turner's testimony was quite prejudicial.

According to Turner, he was made a trustee (or trusty) shortly after he was incarcerated at the Roanoke County Jail in 1996. J.A. 13, ¶ 3. If he could retain trustee status, he would "get a lot of time off [his] original sentence." J.A. 14, ¶ 7. He lost this status, however, when he was found with contraband, a pack of cigarettes. J.A. 13, ¶ 3. Turner's contraband violation led to his reassignment to a different floor,

---

[2]A prosecution expert testified that a shell casing found in Bramblett's pickup had been fired from the revolver found near Mr. Hodges's body. Bramblett argued at trial that the real murderer, who was an enemy of Mr. Hodges, tried to set up Bramblett by planting the shell casing in his truck. The jury could have rejected Bramblett's argument on this point, but that still does not minimize the importance of the allegedly fabricated confession.

where he met Bramblett. Bramblett told Turner he was worried because the police had found some shells that the prosecution was seeking to connect to the Hodges murders. J.A. 13, ¶¶ 3-5. Turner passed this information on to his arresting officer, who was in Vinton, Virginia, where the Hodgeses had been murdered. J.A. 13, ¶ 6. The State Police sent Agent Barry Keesee to see Turner the next day, and that meeting was the first of eight or nine meetings the two would have. J.A. 14, ¶ 6. At the first meeting Turner told Keesee that he was seeking a return to trustee status; Keesee replied that he would probably be able to arrange that. J.A. 14, ¶ 9. Immediately afterwards, Keesee began to feed Turner details of the investigation into the Hodges murders. J.A. 14, ¶ 9. During Keesee's visits Turner would begin by telling Keesee what Bramblett had said about the case. (These statements, Turner now says, were never inculpatory.) J.A. 15, ¶ 12. Keesee would then provide Turner details of the investigation that were new to Turner; and, once Keesee had turned on his tape recorder, Turner would weave these new facts into fabricated accounts of statements attributed to Bramblett. J.A. 14, ¶¶ 10, 12-13. Turner also explained in his affidavit that he did not take notes during his conversations with Bramblett, nor did Keesee ever ask him to do so, J.A. 15, ¶ 11. Turner claims that the two prosecutors, who met with him to prepare his testimony, asked him to write down what he said he had heard from Bramblett so that he could testify that he had made notes of his conversations with Bramblett as they occurred. J.A. 17-18, ¶ 25.

Although restoration of his trustee status was Turner's primary goal, he was also seeking admission to a drug treatment program. J.A. 15-16, ¶ 16. Keesee told Turner that they had to resolve the Hodges case before they could discuss a treatment program. J.A. 16, ¶ 16. Feeling pressured to provide more incriminating evidence, Turner says he told Keesee that Bramblett confessed that when Mrs. Hodges caught him with one of the girls, he "choked the life" out of Mrs. Hodges and then "took care of business" with the girls and Mr. Hodges. J.A. 15, ¶¶ 15, 16. Turner testified at Bramblett's trial that Bramblett made that confession to him. Turner now swears that "Bramblett never said anything to [him] to indicate, expressly or implicitly, that he had anything to do with any of the Hodges' deaths." J.A. 15, ¶ 15.

Turner's affidavit also alleges that he did in fact receive favorable treatment in exchange for his testimony against Bramblett. His trustee status was restored. J.A. 17, ¶ 23. Moreover, he says that he was permitted to attend a county auction without a guard and to return to the jail late with no penalty. Such treatment, he explained, is unheard of for someone serving a twenty-seven year sentence. J.A. 17 ¶ 22. Finally, a reconsideration hearing on his sentence was scheduled prior to the Bramblett trial, but the hearing was purposely delayed until Turner had testified against Bramblett. J.A. 16, ¶ 18. When Turner's hearing was finally held, one of the prosecutor's in Bramblett's case represented the Commonwealth. The prosecutor advised the court of Turner's assistance in the Bramblett case, and "240 days of misdemeanor time" were suspended from Turner's sentence. J.A. 18, ¶ 29.

If Turner is now telling the truth that he made up Bramblett's confession with the assistance of Agent Keesee, there is a reasonable likelihood that Bramblett suffered prejudice. Given the questions raised by the circumstantial case, Turner, the only witness who gave direct evidence (the confession) linking Bramblett to the murders, could have had a powerful effect on how the jury saw the entire case, especially the circumstantial evidence. *See Kyles*, 514 U.S. at 435 (noting that a petitioner may demonstrate a *Brady* violation "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict"). At trial the prosecution acknowledged the importance of Turner's testimony. In his closing a prosecutor noted that this was one of the few pieces of direct evidence linking Bramblett to the murders, J.A. 526, and it is by far the most damaging. Turner's importance to the prosecution was further underscored by the Commonwealth's choice to conclude the presentation of its case with Turner's testimony and to recap Turner's testimony at the end of its closing argument. Finally, as discussed above, if Turner is telling the truth now, the lengths to which the prosecution went to manufacture a confession indicate that Turner's testimony was critical to the prosecution's case.

Turner's testimony therefore provided a framework that allowed the jury to construe ambiguous circumstantial evidence in favor of guilt — a reasonable construction in light of Bramblett's confession. With the confession there was less pressure on the jury to take a critical look at the circumstantial evidence; in other words, the inference

of guilt was much easier to draw. Without the confession the jury would have been forced to confront the weaknesses in the prosecution's case. Turner's allegedly false testimony — that Bramblett confessed to the murders — turned a hard job into an easy job for the jury. There is thus a reasonable likelihood that Turner's false testimony could have affected the judgment of the jury. *Cf. Wilson v. Murray*, 806 F.2d 1232, 1238 (4th Cir. 1986) (finding prejudice from the admission of an improperly obtained confession where the evidence "was not overwhelming and the confession undoubtedly had a substantial effect on [the] conviction"). If Turner committed perjury, Bramblett was prejudiced as a result.

## II.

The next question is whether Bramblett is entitled to an evidentiary hearing to determine whether Turner manufactured the confession. To receive a hearing, Bramblett must (1) allege facts that, if true, would entitle him to relief, (2) overcome 28 U.S.C. § 2254(e)(2)'s limitations on the availability of an evidentiary hearing, and (3) establish one of the six factors mentioned in *Townsend v. Sain*, 372 U.S. 293, 312 (1963). *Fullwood v. Lee*, 290 F.3d 663, 680-81 (2002).[3] To begin with, Bramblett's factual allegations, if true, establish a meritorious *Napue* claim, thus entitling him to relief. As noted above, a claim that the prosecution violated *Napue* by presenting perjured testimony is a form of a *Brady* claim. *See e.g., Strickler*, 527 U.S. at 280-81. A *Brady* claim has three components: (1) the disputed evidence must be favorable to the accused, (2) that evidence must have been suppressed by the prosecution, and (3) prejudice must have ensued. *Strickler*, 527

---

[3]The six *Townsend* factors are:

(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Townsend*, 372 U.S. at 313.

U.S. at 281-82. Assuming Turner's affidavit is true, Bramblett has met this test. First, the fact that Bramblett did not make the alleged incriminating statements is favorable to him. The fact that the prosecution appeared to have sufficient doubts about its case that it sought to manufacture testimony is also favorable to Bramblett. Second, if Turner's affidavit is true, the Commonwealth manufactured evidence against Bramblett and suppressed this fact. Third, as I discuss in part I, Turner's trial testimony, if perjured, was prejudicial to Bramblett.

Next, 28 U.S.C. § 2254(e)(2) does not bar Bramblett from receiving an evidentiary hearing. This section, of course, places a heavy burden on petitioners seeking evidentiary hearings when they have "failed to develop the factual basis of a claim in State court proceedings."[4] 28 U.S.C. § 2254(e)(2). Bramblett, however, cannot be said to have "failed to develop the factual basis of [his] claim" in state court. He had no chance to develop it. Bramblett raised his *Napue* claim in his state habeas petition, his first opportunity to raise it after he learned of Turner's statement that he had perjured himself. Bramblett was denied an evidentiary hearing in state court, and he received no consideration of the claim there because it was procedurally defaulted under *Slayton v. Parrigan*, 205 S.E.2d 680 (Va. 1974) (refusing to review on habeas a claim that could have been, but was not, raised at trial or on direct appeal). Bramblett's inability to develop the facts, and allow the credibility of Turner's story and recantation to be tested, did not stem from negligence or gamesmanship. Rather, it stemmed from the Commonwealth's alleged suppression of its own wrongdoing in fabricating testimony. The prosecution's success in keeping its malfeasance secret for a time made it impossible for Bramblett to raise his *Napue* claim soon enough to receive an evidentiary hearing in state court. Section 2254(e)(2) is not aimed at this sort

---

[4]When the petitioner has failed to develop the facts in state court, he is not entitled to an evidentiary hearing unless (1) his claim is based on a new rule of constitutional law that is retroactively applicable or (2) his claim is based on facts that could not have been discovered earlier through due diligence. § 2254(e)(2)(A). To get a hearing, the petitioner must also show that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." § 2254(e)(2)(B).

of inability or failure, which is beyond the petitioner's control, to develop the factual basis of a claim in state court. A petitioner has only failed to develop the facts within the meaning of § 2254(e)(2) when "there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). As *Williams v. Taylor* makes clear, when the prosecution's wrongdoing, rather than the petitioner's negligence or oversight, is responsible for the failure to have an evidentiary hearing in state court, the defendant has not "fail[ed] to develop" the factual basis of the claim within the meaning of the statute. *See id.* at 434-35 (noting § 2254(e)(2) does not bar a hearing for a petitioner who failed to develop the basis for his claim in state court because "the prosecution concealed the facts"). Because Bramblett alleges that the Commonwealth manufactured false testimony and successfully hid this fact from him, the Commonwealth's actions, rather than Bramblett's, were the essential cause of the procedural default, and Bramblett did not fail through his own fault to develop the factual basis for his *Napue* claim in state court. Section 2254(e)(2), therefore, does not bar an evidentiary hearing for Bramblett.

Finally, Bramblett has satisfied *Townsend* if the merits of the factual dispute, that is, whether Turner committed perjury, were not resolved in state court. *See Townsend*, 372 U.S. at 313. Again, because the state court found his *Napue* claim to be procedurally defaulted, it did not make any factual findings relevant to this claim. Therefore, Bramblett has established one of the *Townsend* factors. Because Bramblett's allegations of Turner's perjury, if true, would establish a meritorious *Napue* claim — and entitle Bramblett to habeas relief — he should receive an evidentiary hearing. *Cf. Beaver v. Thompson*, 93 F.3d 1186, 1190 (4th Cir. 1996) (allowing an evidentiary hearing "when the petitioner alleges additional facts that, if true, would entitle him to relief"). I would therefore vacate the denial of the writ and remand the case for an evidentiary hearing in the district court to determine whether the allegations in Turner's affidavit are true. Turner's claim that he lied when he told the jury that Bramblett had confessed to the Hodges murders must be tested in an evidentiary hearing before Bramblett can be put to death. Again, I respectfully dissent.