WOOD, SUPERINTENDENT, WASHINGTON STATE
PENITENTIARY *v.* BARTHOLOMEW

No. 94–1419.   Decided October 10, 1995

2

PER CURIAM.

The Court of Appeals for the Ninth Circuit reversed the District Court's denial of habeas relief based on its speculation that the prosecution's failure to turn over the results of a polygraph examination of a key witness might have had an adverse effect on pretrial preparation by the defense. The Court of Appeals assumed, and the parties do not dispute, that the results were inadmissible under state law both for substantive purposes as well as for impeachment. The decision below is a misapplication of our *Brady* jurisprudence, see *Brady* v. *Maryland,* 373 U. S. 83 (1963), and we accordingly reverse the judgment of the Court of Appeals and remand for further proceedings.

I

On August 1, 1981, respondent Dwayne Bartholomew robbed a laundromat in Tacoma, Washington. In the course of the robbery, the laundromat attendant was shot and killed. Two shots were fired: One hit the attendant in the head; the second lodged in a counter near the victim's body. From the beginning, respondent admitted that he committed the robbery and that the shots came from his gun.

The only issue at trial was whether respondent was guilty of aggravated first-degree murder, which requires proof of premeditation; or of first-degree (felony) murder, which does not. Respondent's defense was that the gun, a single action revolver (one that must be cocked manually before each shot), discharged by accident—*twice*.

In addition to the physical evidence concerning the operation of the gun, the prosecution's evidence consisted of the testimony of respondent's brother, Rodney Bartholomew, and of Rodney's girlfriend, Tracy Dormady. Both Rodney and Tracy testified that on the day of the crime they had gone to the laundromat in question to do their laundry, and that respondent was sitting in his car in the parking lot when they arrived. While waiting for their laundry, Rodney sat with his brother in the car. Rodney testified that respondent told him that he intended to rob the laundromat and "leave no witnesses." According to their testimony, Rodney and Tracy left the laundromat soon after the conversation and went to Tracy's house. Respondent arrived at the house a short time later, and when Tracy asked respondent if he had killed the attendant respondent said "he had put two bullets in the kid's head." Tracy also testified that she had heard respondent say that he intended to leave no witnesses. Both Rodney and Tracy's testimony was consistent with their pretrial statements to the police. *State* v. *Bartholomew*, 98 Wash. 2d 173, 176–178, 654 P. 2d 1170, 1173–1174 (1982).

Respondent testified in his own defense. He admitted threatening the victim with his gun and forcing him to lie down on the floor. Respondent said, however, that while he was removing money from the cash drawer his gun accidently fired, discharging a bullet into the victim's head. Respondent further claimed that the gun went off a second time while he was running away. Respondent denied telling Rodney or Tracy that he intended to leave no witnesses. According to his testimony, moreover, Rodney had assisted in

the robbery by convincing the attendant to open the laundromat's door after it had closed for the night, although Rodney left before the crime was committed. *Ibid.* In closing argument the defense sought to discredit Rodney and Tracy's testimony by suggesting that they were lying about the extent of Rodney's participation in the crime. 34 F. 3d 870, 872 (CA9 1994).

At the sentencing phase of the trial (respondent was sentenced to death but his sentence was overturned on appeal and he was resentenced to life imprisonment without the possibility of parole), the prosecution's first witness was respondent's cellmate, Stanley Bell. Bell testified that respondent told him that he made the victim lie on the floor, asked him his age, found out it was 17, replied "[t]oo bad," and shot him. See *State* v. *Bartholomew, supra,* at 178, 654 P. 2d, at 1174.

Before trial, the prosecution requested that Rodney and Tracy submit to polygraph examinations. The answers of both witnesses to the questions asked by the polygraph examiner were consistent with their testimony at trial. As part of the polygraph examination, the examiner asked Tracy whether she had helped respondent commit the robbery and whether she had ever handled the murder weapon. Tracy answered in the negative to both questions. The results of the testing as to these questions were inconclusive, but the examiner noted his personal opinion that her responses were truthful. The examiner also asked Rodney whether he had assisted his brother in the robbery and whether at any time he and his brother were in the laundromat together. Rodney responded in the negative to both questions, and the examiner concluded that the responses to the questions indicated deception. Neither examination was disclosed to the defense.

After exhausting his state remedies, respondent filed a habeas action in the District Court for the Western District of Washington, raising, *inter alia,* a *Brady* claim based on the

prosecution's failure to produce the polygraph examinations. The District Court denied the writ, concluding that respondent "fails . . . to show that *evidence* was withheld. *The information withheld only possibly could have led to some admissible evidence.* He fails to show that disclosure of the results of the polygraph to defense counsel would have had a reasonable likelihood of affecting the verdict." App. to Pet. for Cert. B5 (emphasis in original).

On appeal, the Ninth Circuit reversed. 34 F. 3d 870 (1994). The Court of Appeals noted that under Washington law polygraphic examinations are inadmissible in evidence, even for impeachment purposes. See *id.,* at 875 (citing *State* v. *Ellison,* 36 Wash. App. 564, 676 P. 2d 531 (1984)). The court nevertheless reversed the District Court's denial of the writ, concluding that although the results would have been inadmissible at trial, the information was material under *Brady.* The court reasoned that "[h]ad [respondent's] counsel known of the polygraph results, he would have had a stronger reason to pursue an investigation of Rodney's story"; that he "likely would have taken Rodney's deposition" and that in that deposition "might well have succeeded in obtaining an admission that he was lying about his participation in the crime" and "would likely have uncovered a variety of conflicting statements which could have been used quite effectively in cross-examination at trial." 34 F. 3d, at 875–876.

## II

If the prosecution's initial denial that polygraph examinations of the two witnesses existed were an intentional misstatement, we would not hesitate to condemn that misrepresentation in the strongest terms. But as we reiterated just last Term, evidence is "material" under *Brady*, and the failure to disclose it justifies setting aside a conviction, only where there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different. *Kyles* v. *Whitley,* 514 U. S. 419, 433–434 (1995);

*United States* v. *Bagley*, 473 U. S. 667, 682 (1985) (opinion of Blackmun, J.); *id.*, at 685 (White, J., concurring in part and concurring in judgment). To begin with, on the Court of Appeals' own assumption, the polygraph results were inadmissible under state law, even for impeachment purposes, absent a stipulation by the parties, see 34 F. 3d, at 875 (citing *State* v. *Ellison, supra*), and the parties do not contend otherwise. The information at issue here, then—the results of a polygraph examination of one of the witnesses—is not "evidence" at all. Disclosure of the polygraph results, then, could have had no direct effect on the outcome of trial, because respondent could have made no mention of them either during argument or while questioning witnesses. To get around this problem, the Ninth Circuit reasoned that the information, had it been disclosed to the defense, might have led respondent's counsel to conduct additional discovery that might have led to some additional evidence that could have been utilized. See 34 F. 3d, at 875. Other than expressing a belief that in a deposition Rodney might have confessed to his involvement in the initial stages of the crime—a confession that itself would have been in no way inconsistent with respondent's guilt—the Court of Appeals did not specify what particular evidence it had in mind. Its judgment is based on mere speculation, in violation of the standards we have established.

At trial, respondent's strategy was to discredit Rodney's damaging testimony by suggesting that Rodney was lying in order to downplay his own involvement in the crime. *Id.*, at 872. That strategy did not involve deposing Rodney. It is difficult to see, then, on what basis the Ninth Circuit concluded that respondent's counsel would have prepared in a different manner, or (more important) would have discovered some unspecified additional evidence, merely by disclosure of polygraph results that, as to two questions, were consistent with respondent's preestablished defense.

In speculating that the undisclosed polygraph results might have affected trial counsel's preparation, and hence the result at trial, the Ninth Circuit disagreed with, or disregarded, the view of respondent's own trial counsel. At the evidentiary hearing held in the Federal District Court in this habeas action, respondent's habeas counsel questioned trial counsel on the importance of the polygraph results:

> "Q: And you indicated that your cross-examination of Rodney was, I think, somewhat limited because of concern that—
>
> "A: It was limited in my own respect. Nobody tried to limit me. In my opinion, as a trial lawyer, that was a very dangerous witness to me, and I wanted to get as much as I could out of him without recalling the crystal words again. Leave no prisoners.
>
> "Q: Do you think it would have been any help to you in doing that, if you had known of specific questions regarding the offense on which Mr. Rodney Bartholomew had failed a polygraph examination? Would that have perhaps affected the shape of your cross-examination of him?
>
> "A: I think in retrospect they're almost parallel. The questions that he failed were his contribution or implication in the offense, the holdup, with Mr. Dwayne Bartholomew. I believe they were in gloves, so in retrospect they wouldn't have affected it. I would have liked to have known it, Mr. Ford, but I don't think it would have affected the outcome of the case." Tr. 55–56.

Trial counsel's strategic decision to limit his questioning of Rodney undermines the suggestion by the Court of Appeals that counsel might have chosen to depose Rodney had the polygraph results been disclosed. But of even greater importance was counsel's candid acknowledgment that disclosure would not have affected the scope of his cross-

examination. That assessment is borne out by the best possible proof: The Federal District Court below went so far as to permit respondent's habeas counsel, armed with the information about the polygraph examinations, to question Rodney under oath. Even though respondent's counsel was permitted to refer to the polygraph results themselves—reference to which would not be permissible on retrial—counsel obtained no contradictions or admissions out of Rodney. See *id.*, at 84–87.

In short, it is not "reasonably likely" that disclosure of the polygraph results—inadmissible under state law—would have resulted in a different outcome at trial. Even without Rodney's testimony, the case against respondent was overwhelming. To acquit of aggravated murder, the jury would have had to believe that respondent's single action revolver discharged accidently, not once but twice, by tragic coincidence depositing a bullet to the back of the victim's head, execution style, as the victim lay face down on the floor. In the face of this physical evidence, as well as Rodney and Tracy's testimony—to say nothing of the testimony by Bell that the State likely could introduce on retrial—it should take more than supposition on the weak premises offered by respondent to undermine a court's confidence in the outcome.

Whenever a federal court grants habeas relief to a state prisoner the issuance of the writ exacts great costs to the State's legitimate interest in finality. And where, as here, retrial would occur 13 years later, those costs and burdens are compounded many times. Those costs may be justified where serious doubts about the reliability of a trial infested with constitutional error exist. But where, as in this case, a federal appellate court, second-guessing a convict's own trial counsel, grants habeas relief on the basis of little more than speculation with slight support, the proper delicate balance between the federal courts and the States is upset to a degree that requires correction.

\* \* \*

The petition for certiorari is granted, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion. The respondent's motion to proceed *in forma pauperis* is granted.

*It is so ordered.*

JUSTICE STEVENS, JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER dissent from summary disposition of this case.