COURT OF APPEALS OF VIRGINIA


Present: Judges Benton, Annunziata and Senior Judge Coleman
Argued at Richmond, Virginia


KEITH MARVELLE TAYLOR, A/K/A
 KEITH WILLIAMS
                                          OPINION BY
v.   Record No. 3410-01-2        JUDGE SAM W. COLEMAN III
                                       SEPTEMBER 2, 2003
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                     Thomas N. Nance, Judge

          John W. Luxton (Morchower, Luxton & Whaley,
          on brief), for appellant.

          Stephen R. McCullough, Assistant Attorney
          General (Jerry W. Kilgore, Attorney General;
          Linwood T. Wells, Jr., Assistant Attorney
          General, on brief), for appellee.


     Keith M. Taylor was convicted in a bench trial of attempted

malicious wounding, shooting at an occupied dwelling, and using

a firearm in the commission of a felony.  Taylor contends the

Commonwealth committed a Brady violation that deprived him of a

fair trial.  He argues that the undisclosed investigatory notes

of the two detectives who interviewed witnesses at the crime

scene contained accounts that were exculpatory and inconsistent

with the witnesses' trial testimony.  Specifically, he claims

that several of the witnesses' accounts did not mention that

Taylor was "out there shooting at the scene of the crime" and

that the failure to mention Taylor as one of the shooters was

inconsistent with their testimony.  The trial court ruled that the investigatory accounts contained in the detectives' notes were not inconsistent with the witnesses' trial testimony and, therefore, the trial court denied the motion for a new trial. Finding no error, we affirm the convictions.

I.

Taylor was indicted for attempted malicious wounding, Code § 18.2-51, maliciously shooting at an occupied building, Code § 18.2-279, and using a firearm while committing a felony, Code § 18.2-53.1.  Prior to trial, Taylor's attorney filed a discovery motion, requesting exculpatory information and evidence affecting the credibility of any of the prosecution witnesses.  The prosecutor responded she was unaware of any evidence tending to exculpate Taylor or affecting the credibility of the Commonwealth's witnesses.

At trial, James Hill, one of the Commonwealth's witnesses, testified that following a confrontation between himself and Taylor and James Nash, during which Hill displayed a handgun, Taylor and Nash drove to his residence in separate vehicles. According to Hill, they exited their vehicles and both began firing handguns at him while he stood on his front porch.  Hill and his wife, Vicky Hill, resided at the house with their adult children, Felicia and Sentel Hill.  Vicky and Felicia Hill testified that appellant was one of the two "guys" involved in the shooting at their home.  Felicia Hill repeatedly testified

- 2 -

that she "saw them shooting." (Emphasis added.) Sentel Hill did not testify that Taylor was one of the shooters; nor did Florissa Banks testify to that effect. At trial there was a discrepancy between the testimony of James, Felicia and Sentel Hill as to which of two cars the appellant and Nash exited.

Detective McTernan's notes recorded the events that preceded the shooting and notes that "Nash . . . starts firing." She also records the statement that a "burgundy Cadillac pulled up [and the] guy got out [and] started walking toward [the] house [and] starts firing." However, specific statements were not attributed to particular witnesses.

Detective Thompson's notes of his interview with James Hill disclose that Hill identified both Keith Taylor and James Nash as armed with guns and shooting. His notes recounting his interview with Sentel Hill included descriptions of appellant and Nash and statements that they "started fighting." The notes, however did not reflect any comment from Sentel Hill on the shooting that ensued. Thompson's notes of Felicia Hill's pretrial interview state "guy got out of car and walked toward house started shooting randomly." Thompson's notes of the interview with Florissa Banks, a neighbor of the Hills, state, "Keith [Taylor] started shooting walked toward house."

After the convictions, Taylor's attorney filed a motion to set aside and vacate the verdicts. Following an evidentiary hearing, the trial judge found that "[n]ot one person has said

- 3 -

anything inconsistent with the fact that your client [was] out there shooting."  The trial judge denied Taylor's motion for a new trial, and this appeal followed.

## II.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963).  The Supreme Court reasoned that:

> [a] prosecution that withholds evidence
> . . . which, if made available, would tend
> to exculpate [the accused] or reduce the
> penalty helps shape a trial that bears
> heavily on the defendant.  That casts the
> prosecutor in the role of an architect of a
> proceeding that does not comport with
> standards of justice, even though . . . his
> action is not "the result of guile."

Id. at 87-88 (citation omitted).

The Supreme Court has held that "[i]mpeachment evidence . . . , as well as exculpatory evidence, falls within the Brady rule."  United States v. Bagley, 473 U.S. 667, 676 (1985) (citing Giglio v. United States, 405 U.S. 150, 154 (1972)).  The Bagley Court stated:

> The present case . . . does not involve
> any direct restriction on the scope of
> cross-examination.  The defense was free to
> cross-examine the witnesses on any relevant
> subject, including possible bias or interest
> . . . .  The constitutional error, if any,
> in this case was the Government's failure to

- 4 -

assist the defense by disclosing information that might have been helpful in conducting the cross-examination. . . . [S]uch suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial. Consistent with "our overriding concern with the justice of the finding of guilt" a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial.

Id. at 678 (citation omitted).

Explaining Bagley's materiality analysis, the Supreme Court has said:

Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted unlimitedly in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). Bagley's touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict [worthy] of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

Kyles v. Whitley, 514 U.S. 419, 434 (1995) (citations omitted).

III.

The testimony of Detectives McTernan and Thompson concerning the witnesses' pretrial statements did not identify inconsistent or contradictory statements that could have been used to impeach a particular witness. The investigatory notes, to the effect that "they" were shooting, or that "they" got out of their cars and started shooting, or which specifically identified Nash, but did not specifically mention Taylor by name, are not inconsistent with the witnesses' trial testimony. Moreover, to the extent that the detectives' notes would support a claim that the witnesses identified only Nash and did not mention Taylor, we do not believe that on this record the disclosure would have materially affected the outcome of the case. Therefore, the trial court did not err in concluding that the Commonwealth did not withhold exculpatory evidence from the accused.

First, neither the investigative notes nor the evidentiary hearing testimony of Detective McTernan contains specific statements attributable to a particular witness. At best, her notes contained general accounts and sketchy conclusions without attribution of what various witnesses said about how the events unfolded. Absent attribution to a particular witness, McTernan's general account of inconsistent or contradictory statements would not have been admissible as a prior inconsistent statement to impeach a particular witness.

Furthermore, the appellant has not shown how the disclosure of McTernan's notes would have led to the discovery of exculpatory evidence which would have been admissible at trial.  Evidence that is not admissible at trial or which does not lead to admissible exculpatory evidence cannot violate Brady because there is no "reasonable probability" that its disclosure would have affected the trial.  Wood v. Bartholomew, 516 U.S. 1, 5-6 (1995) (no Brady violation for failure to disclose polygraph tests which are inadmissible under state law).

Second, none of the accounts which Detective Thompson attributed to specific witnesses were materially contradictory of or inconsistent with those witnesses' trial testimony. Thompson indicated that he interviewed James Hill, Sentel Hill, Felicia Hill, and Florissa Banks.[1]  Thompson's notes indicated that James Hill identified both Keith Taylor and James Nash as being armed and firing shots.  That account was consistent with James Hill's trial testimony.  According to Thompson's testimony and his notes, none of the witnesses he interviewed stated during the investigative interviews that Taylor was not "a shooter," that he did not fire shots, that he did not possess a gun, or that he was not there.  Furthermore, although Felicia

---

[1] Florissa Banks told Detective Thompson pre-trial that "Keith [Taylor] started shooting [as he] walked toward [the Hill] house.  However, at trial she denied that she saw Taylor with a gun or that he was shooting.  The failure to disclose this material cannot be deemed a violation of Taylor's rights under Brady.

Hill's account to Thompson appears to identify James Nash as the person who first exited a car and advanced toward James Hill firing a handgun, she did not exclude Taylor from being "a shooter." Thus, although Felicia Hill testified at trial that Taylor fired shots, we cannot say that her pretrial statements to Thompson were inconsistent with or contradictory to her trial testimony. Although Sentel Hill's trial testimony implicated Taylor as one of the shooters, this testimony was not inconsistent with a pretrial statement that merely failed to address the shooting at all. Finally, to the extent that various witnesses may have given different accounts during the investigative interviews, as they did at trial, as to whether Nash or Taylor or the person with "braids" or "corn rows" exited the Cadillac or Toyota, the description and designation of which car Nash or Taylor exited was not critical to the identification of who was shooting. Any confusion or inconsistency in the investigative reports or at trial as to which car Nash or Taylor occupied was not material because had that "inconsistency" been disclosed it would not have changed the trial result.

In summary, no witness reported during the investigation that Nash was the sole shooter or that Taylor did not shoot. No investigative statement of any witness who testified at trial was exculpatory or inconsistent with their trial testimony. Accordingly, the Commonwealth was not required to provide Taylor with the investigative notes of McTernan and Thompson because

1) they contained no statements by a particular witness that were inconsistent with or contradictory to that witness' or another witness' material testimony, and 2) no specific statement by a particular witness constituted a prior inconsistent statement which could have been used to impeach either the declarant or another witness.  The information reflected in the pretrial accounts of the witnesses' statements would not have produced a "reasonable probability" of a different result.  For these reasons, the ruling of the trial court is affirmed.

Affirmed.

Benton, J., dissenting.

At the heart of the trial judge's decision to deny Keith M. Taylor's motion for a new trial is the absence of what he perceived as exculpatory evidence. The judge explained that "[m]ost people testify to, you know, what they remember, and from what the [officers'] notes say, there is absolutely nothing here that is exculpatory. Not one person has said anything inconsistent with the fact that [Taylor was] out there shooting." He further posed the question: "Don't you think that if anybody had said that he wasn't shooting, that he didn't have nothing to do with it, that they would have reported it and they would have testified?" Because I believe the judge used the wrong standard and erred in his ruling, I would reverse the convictions and remand for a new trial.

I.

To put the judge's ruling in context, a comprehensive review of the evidence is warranted. At trial, the Commonwealth's evidence proved that Keith Taylor and James Nash, who were teenagers, fought with James Hill's son in the driveway at Hill's house. When Hill went to investigate the commotion, Taylor and Nash walked away. A short time later, a group of girls argued with Hill's daughter about a gold chain and began to fight her. During that fight, Hill intervened and threw one of the girls to the ground. After the girls ran away, Hill drove his car to find Taylor and Nash. When he saw them a short distance from his house, he exited his car and asked "what was going on?" Taylor did not speak. Hill was holding a gun and left after he had a discussion with Nash.

- 10 -

Hill and his wife testified that they were sitting on their front porch when Taylor and Nash returned half an hour later. Nash arrived first in a burgundy Cadillac that was driven by Kelly Hicks, the girl that Hill earlier threw to the ground. Taylor arrived in a green Toyota Camry. Hill testified that Hicks was the first to exit the vehicle, followed by Taylor and Nash, who were both holding .22 caliber long barrel pistols. When they began to shoot, Hill went to his kitchen and retrieved a "357" revolver. He testified that "[a]bout three or four" shots had been fired before he returned to his porch and began to shoot at them. He also testified that Taylor was standing by the mailbox, that Nash was standing closer to Hill, and that Taylor and Nash fired a total of 12 shots. Hill said he shot six times and believed he hit Taylor because Taylor appeared to fall onto the car.

Hill's wife testified that Nash and Taylor arrived in separate cars and "came out shooting." She also testified that she saw a gun in Taylor's hand and noticed he was "walking as he was pointing and shooting." After she heard three shots, two of which came from Taylor's direction, Hill pushed her into the house. She testified, however, that she could still see Nash and Taylor through the window and saw Taylor near the mailbox. She testified that she saw "the other guy," meaning Nash, fall back into his car as her husband was shooting. Although she initially testified that Taylor exited the second car, which she described as the "large car," she later testified that "the car behind [Taylor] . . . was the bigger car."

- 11 -

Hill's daughter was in the doorway holding her baby when Taylor and Nash arrived. She testified she had "blacked out" after the fight and had only a brief period to recover before the shooting incident. She also testified that "[w]hen the two cars drove up, one girl got out . . . ranting and raving, and then a whole bunch of other people jumped out." She said Taylor was "at the mailbox, and the other guy [was] . . . coming down the driveway." She heard two shots and then "ran further into the house," but she repeatedly testified that she "saw them shooting."

Hill's son testified that he was sitting in his car in the driveway and facing the house when "Nash walk[ed] up, not even ten feet from the house and started shooting." Nash shot twice. He then saw Taylor near the mailbox. After three bullets struck the rear of his car, he ducked. He testified, however, that he "didn't see who shot [his car, and] just saw [Taylor] behind [his] car." He also indicated that "when [Nash fired], that's when the bullet holes came." He further testified that his father was returning fire in Nash's direction as Nash was "running back toward the street" and that one of Hill's bullets hit Hill's own car.

At the conclusion of the Commonwealth's case-in-chief, Taylor's attorney called as a witness the detective to whom the case had been assigned. Detective William Thompson testified that he took photographs at the residence but did not photograph any of the vehicles. He also testified that other officers who investigated the events delivered to him their reports and several cartridge cases. When the prosecutor objected to the

- 12 -

admission of the certificate of analysis concerning those cartridge cases, Taylor's attorney requested a continuance and argued that "this evidence we've been furnished has turned out to be exculpatory evidence." The judge admitted the certificate as evidence and denied the request for a continuance. The certificate of analysis indicated that "a total of six . . . caliber 22 Long/Long Rifle cartridge cases" were submitted for examination and that all had "been fired in one . . . firearm."

Taylor's witnesses gave a different account of the shooting. Nash testified that he and Hill's son had a fistfight while Taylor watched. After Hill arrived and stopped the fight, Nash and Taylor left but were later confronted by Hill, who pointed a gun at Nash and demanded to know why he was fighting Hill's son. After Hill left, Nash retrieved a twenty-two caliber pistol and returned to Hill's house in Hicks's burgundy Cadillac. He said Taylor was in a green Toyota. Nash testified that he saw Hill run into the house and he noticed four other people on the porch. When he exited the car, Hill had returned with a gun. Nash testified that Hill shot first and he and Hill then "started shooting at each other." He shot his gun "five or six" times, and Hill shot six times. Nash testified that Taylor and the people on the porch ran away during the shooting. He also testified that Taylor did not have a gun. Nash said his own hair was in braids at the time of the incident.

Vanielle Miller testified that she had been involved in the fight with Hill's daughter. Later, she and Taylor arrived at Hill's house in a green Toyota, which was being driven by another teenager. She said Taylor exited the car, remained behind the

- 13 -

car, and did not go toward the yard.  She also said Taylor was not near the mailbox and did not have a gun.  She testified that, although she saw Hill shoot, she did not see Nash shoot.

Taylor testified that he had been involved in the fight with Hill's son.  He denied having a gun when he arrived at Hill's residence and also denied standing next to the mailbox.  He testified that he had no reason to be armed because Hill did not threaten him with the gun when Hill earlier exited his car and pointed a gun at Nash.  He also denied knowing Nash had a gun.  Taylor testified that when the first shot was fired, he was close to the Toyota's door and immediately reentered the Toyota.  He said he did not fall back on the car.  Taylor admitted he initially lied when he told a detective that he was not present at the shooting.

Florissa Banks, Hill's neighbor, testified that she saw Taylor fighting Hill's son.  From her house across the street, she later observed two cars stop in front of Hill's house.  She saw a man, who was not Taylor, exit a burgundy Cadillac.  That man, who had braids in his hair, "pulled out a gun and was walking across the driveway and across the lawn."  Hill was coming out his door and trying to get his family inside.  Banks then saw Taylor exit his car, but did not see anything in his hands.  From "the way [Taylor] was standing," Banks could not see whether Taylor had a gun in his hands.  She testified that "[t]he one that was shooting was [wearing] braids."  Once shooting commenced, Banks turned to get the children into the house.  She saw the man with the braided hair and Hill shoot at each other

- 14 -

"approximately five or six" times. Banks only observed Taylor get out of his car and stand next to it.

On rebuttal, Hill testified that two bullets hit his house and that he believed "at least three" hit his car. He also testified that he gave a detective cartridge cases from his .357 caliber weapon and that he and the detective found "eight to twelve" .22 caliber cartridge cases on his porch and yard.

Recalling Hill's testimony, the trial judge noted that he "said it looked like both of them had revolvers. He apparently knows the difference in a revolver if he has one himself." Finding that the group of people went to the Hill residence to "continue this and that [Taylor] was right in the middle of it," the trial judge convicted Taylor of attempted malicious wounding, Code § 18.2-51, shooting at an occupied dwelling, Code § 18.2-279, and using a firearm in the commission of a felony, Code § 18.2-53.1.

## II.

After the conviction, Taylor's attorney filed a post-trial motion to vacate the verdict. At the evidentiary hearing, Detective Jan McTernan testified that she interviewed several people at the Hill residence after the shooting. She recalled talking to Hill and "believed [she] also talked to . . . Hill's son." Her notes indicate that she was told a "green car stopped, popped the trunk, [Cadillac] stops too." Her notes then indicate "Nash with braids walks out and starts firing" and "today Nash confronts him." In addition, Detective McTernan wrote the following:

"Lady gets out of dark green Camry,
. . . several people out side of the house,
burgundy Cadillac pulled up, guy got out,
started walking toward house [and] starts
firing.  Father returned fire . . . the Camry
left on Goodwood Road, and [Cadillac] went
straight out of Deter."

Detective McTernan did not recall seeing bullet holes in Hill's son's car.

Detective Thompson also testified about notes he made during telephone conversations with various witnesses.  Hill told him that, "Keith [Taylor] got out of the Cadillac, walked towards house with gun in hand, James Nash got out of Toyota, they both started shooting."  Hill's daughter, on the other hand, said, "two cars pulled up. . . . Guy got out of car and walked and up toward house, started shooting randomly. . . .  Hill shot back at guy with gun."  She also identified Nash as having "corn rows."

Reasoning that "[n]ot one person has said anything inconsistent with the fact that [Taylor was] out there shooting," the trial judge denied Taylor's motion for a new trial.

### III.

The majority concludes that the Commonwealth was not required to provide Taylor with the officers' notes. Significantly, however, the Commonwealth does not contend on appeal that the undisclosed material was not favorable to Taylor. The Commonwealth contends, instead, only that Taylor is not entitled to a new trial because he was not "prejudiced by not receiving complete discovery."  Taylor contends that the notes would have allowed significant impeachment of the Commonwealth's witnesses and would have strengthened his defense.

The Commonwealth's duty to disclose extends beyond evidence that clearly exculpates. The Supreme Court has unambiguously "rejected any . . . distinction between impeachment evidence and exculpatory evidence." United States v. Bagley, 473 U.S. 667, 676 (1985). In this case, portions of the officers' notes would have allowed Taylor to impeach the testimonies of some of the Commonwealth's witnesses. The majority misses the point when it concludes that the officers' notes are inadmissible because the statements were not "attributable to a particular witness." Addressing a contention that the undisclosed evidence might not be admissible, we have ruled as follows:

> Even if the [evidence] was inadmissible, it may have affected the defendant's trial preparation. A factor in determining the materiality of undisclosed information is "[a]ny adverse effect that the prosecutor's failure to respond might have had on the preparation and presentation of the defendant's case."
>
> An extrajudicial statement may be vitally important in the preparation and conduct of a criminal trial. It may identify witnesses and other resources for further investigation. It may be used to refresh a witness' recollection. It may be used under certain circumstances as evidence of a past recollection recorded.
>
> Such a statement may also be used as a basis for cross-examining witnesses.

White v. Commonwealth, 12 Va. App. 99, 103-04, 402 S.E.2d 692, 695, aff'd on reh'g en banc, 13 Va. App. 284, 410 S.E.2d 412 (1991) (citations omitted). Obviously, if the Commonwealth had properly disclosed the notes, Taylor's attorney could have asked the officers at trial to identify the witnesses who made the

- 17 -

statements.  Taylor's attorney also could have directly asked the witnesses whether they made the statements.  <u>Edwards v. Commonwealth</u>, 19 Va. App. 568, 571, 454 S.E.2d 1, 2 (1995).  "It is generally held in Virginia and elsewhere that, after a proper foundation has been laid, the credibility of a witness may be impeached by proof of statements made by him on some prior occasion that are inconsistent with or contradictory of the evidence he has given on the trial."  <u>Cassady v. Martin</u>, 220 Va. 1093, 1099, 266 S.E.2d 104, 107 (1980).  Therefore, in this case, the notes would have utility at trial and certainly would have allowed Taylor to pursue these issues when preparing for trial.

The posture of this case is similar to the circumstances addressed in <u>Bagley</u>.

> The present case . . . does not involve any direct restriction on the scope of cross-examination.  The defense was free to cross-examine the witnesses on any relevant subject, including possible bias or interest. . . .  The constitutional error, if any, in this case was the Government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination. . . . [S]uch suppression of evidence amounts to a constitutional violation . . . if it deprives the defendant of a fair trial. Consistent with "our overriding concern with the justice of the finding of guilt" a constitutional error occurs, and the conviction must be reversed, . . . if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial.

473 U.S. at 678 (citation omitted).  The prosecutor further had a "duty to disclose exculpatory [and impeachment] material in a timely manner."  <u>Monroe v. Angelone</u>, 323 F.3d 286, 316 (4th Cir.

- 18 -

2003). That duty "'illustrate[s] the special role played by the American prosecutor in the search for truth in criminal trials.'" Id. (citation omitted). As the Supreme Court long ago noted:

> The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.

Berger v. United States, 295 U.S. 78, 88 (1935).

At trial, Hill's daughter testified that Taylor and Nash were both involved in the shooting. She indicated that Taylor stood next to a mailbox and walked to the "halfway point" of the yard. Even though she did not see the position of Taylor's hands and body, she testified that "[she] just saw them shooting." Her testimony, however, could have been severely undermined if Taylor's attorney had known of her pretrial statements. According to Officer Thompson's notes, Hill's daughter said: "Guy got out of car and walked and up toward house, started shooting randomly, Mr. Hill shot back at guy with gun." (Emphases added.) This statement is entirely consistent with Taylor's contention that Nash alone did the shooting, and it is inconsistent with Hill's daughter's trial testimony and the Commonwealth's theory that both men fired guns.

Furthermore, Hill's daughter's pretrial statements had the effect of confirming Banks's testimony. Hill's daughter described Nash to the detectives as having "corn rows" in his hair. Although Banks did not know the name of the shooter, she testified that "[t]he one that was shooting was [in] braids."

- 19 -

The evidence established that only Nash had the "braids" or "corn rows" hairstyle.  In addition, neither Hill's daughter's statement nor Banks's testimony established that a second shooter actually existed.  Hill's daughter implicated one "[g]uy," and Banks testified that "[t]he one that was shooting was [in] braids."  (Emphasis added.)

Banks, who did not know Taylor prior to this incident, testified that he was standing by the mailbox and that she did not see a gun in his hand.  The undisputed evidence at trial was that Nash, not Taylor, wore his hair in the style of "corn rows." Although the majority observes that Banks told Detective Thompson pre-trial that "Keith [Taylor] started shooting [as he] walked toward [the Hill] house," the detective's notes also indicate that Banks said "Keith" had "corn rows."  This fact likely explains why the prosecutor did not seek to impeach Banks's testimony at trial when she testified that "the one that was shooting [had] braids" and was walking up the driveway to house.

Detective McTernan's notes of the pretrial interviews specifically indicate:  "Cadillac pulled up, guy got out, started walking toward house and started firing."  Her notes also contain the sentence, "Nash w/ braids walks up and starts firing."  The notes are consistent with Taylor's defense that Nash was the only shooter and also are consistent with the certificate of analysis, which indicates that the police submitted for examination six cartridge cases -- all of which were identified as having been fired from one gun.  No police witness supports Hill's testimony that "eight to twelve" .22 caliber cartridge cases were recovered.

- 20 -

Perhaps even with this impeachment, the trial judge could still rely on testimonies of the witnesses to convict Taylor. "But, the question is not whether the State would have had a case . . . if it had disclosed the favorable evidence, but whether we can be confident that the . . . verdict would have been the same." Kyles v. Whitley, 514 U.S. 419, 453 (1995). The Supreme Court has explained the test as follows:

> Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted unlimitedly in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). Bagley's touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

Id. at 434 (citations omitted).

The Supreme Court also has placed "emphasis" on the principle that the materiality analysis "is not a sufficiency of evidence test." Id. at 434. Thus, "[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Id. at 434–35. Instead, a defendant only needs to show "that the favorable evidence could reasonably

be taken to put the whole case in such a different light as to undermine confidence in the verdict."  Id. at 435.

The reliability of the Commonwealth's witnesses' versions of events was not unimpeachable.  Although both Hill and his wife identified two shooters, portions of Hill's testimony are inconsistent with the detective's notes, which indicate Hill said, "[Taylor] got out Cadillac."  Testifying she observed the bulk of the shootings from inside the house, Hill's wife also demonstrated inaccuracies that question the quality of her account.  For example, although other testimonies proved that Nash was the first to shoot, that Taylor was standing next to either the Toyota or the mailbox, and that Hill pushed his wife into the house immediately after the initial shots, Hill's wife nevertheless testified that she was able to observe a gun in Taylor's hands and that Taylor "was walking as he was pointing and shooting."  Other witnesses testified that it was Nash who was shooting as he walked toward the house.  In addition, contrary to Hill's testimony, his wife indicated that Nash was the person who fell back onto the car.

Likewise, although Hill's daughter testified "they" were shooting, she ran further into the house after hearing two shots. Hill's son testified, however, that Nash fired the first two shots.  Hill's son also testified that he observed Taylor by the mailbox, but he was ducking in the vehicle and did not actually see Taylor in the act of shooting a gun.  In light of these accounts and the disclosures in the pretrial interviews, Taylor's defense, that the Commonwealth's witnesses mistook Nash for Taylor as the events quickly unfolded, certainly would be

- 22 -

strengthened.  In short, as the Supreme Court noted in <u>Kyles</u>, "[d]isclosure of their statements would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense."  514 U.S. at 441.

This evidence "if disclosed and used effectively," <u>Bagley</u>, 473 U.S. at 676, would have brought into sharp focus Taylor's defense that the witnesses' trial testimony was simply mistaken and, in some instances, contradictory to their pretrial recollection of the events.  Confidence that the verdict would have been unaffected cannot survive when suppressed evidence would have allowed the fact finder to conclude that some key witnesses previously failed to implicate Taylor as a shooter, that pretrial statements are consistent with the certificate of analysis' finding that a single gun fired all the recovered bullets, and that the only disinterested witness, Banks, did not observe Taylor with a gun or fire a shot.  I would hold, therefore, that the notes that the Commonwealth should have disclosed to Taylor's attorney contained impeachment and exculpatory evidence and were material.  Because the suppression of the evidence in this case "undermines confidence in the outcome of the trial," <u>Bagley</u>, 473 U.S. at 678, I dissent.