# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JOHN BUTSINAS,

Defendant-Appellant.

UNPUBLISHED
January 23, 2018

No. 327796
Macomb Circuit Court
LC No. 2014-001163-FH

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JOHN BUTSINAS,

Defendant-Appellant.

No. 327799
Macomb Circuit Court
LC No. 2014-000167-FC

Before: SHAPIRO, P.J., and GLEICHER and O'BRIEN, JJ.

O'BRIEN, J. (*concurring in part and dissenting in part*).

The majority's holding is limited to (1) affirming defendant's conviction for witness intimidation in Docket No. 327796 and (2) vacating defendant's CSC convictions and remanding for a new trial in Docket No. 327799 because the prosecution allegedly withheld two CPS reports, which the majority believes constituted a *Brady*[1] violation. I agree that there was sufficient evidence to support defendant's conviction for witness intimidation, but I disagree that defendant's CSC convictions should be vacated. Therefore, with regard to that portion of the majority's holding, I respectfully dissent.

This Court reviews due process claims, such as allegations of a *Brady* violation, de novo. *People v Dimambro*, 318 Mich App 204, 212; 897 NW2d 233 (2016). "[T]he components of a

---

[1] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

-1-

'true *Brady* violation,' are that: (1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014).

Accepting the majority's conclusion that the prosecution should be held responsible for possessing the 2010 and 2013 CPS reports[2] and that those reports should have been provided to defense counsel at trial, a new trial is not necessary because the reports are not material when viewed in totality. "To establish materiality, a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Chenault*, 495 Mich at 150 (citation and quotation marks omitted). " 'A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " *Id*. quoting *United States v Bagley*, 473 US 667, 682; 105 S Ct 3375; 87 L Ed 2d 481 (1985). "The question is whether, in the absence of the suppressed evidence, the defendant 'received a fair trial, understood as a trial resulting in a verdict worthy of confidence.' " *Chenault*, 495 Mich at 150-151, quoting *Kyles v Whitley*, 514 US 419, 434; 115 S Ct 1555; 131 L Ed 2d 490 (1995). In other words, "the materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions," but rather "the question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Strickler v Greene*, 527 US 263, 290; 119 S Ct 1936; 144 L Ed 2d 286 (1999), quoting *Kyles*, 514 US at 435.

First, addressing the 2013 report, nothing in the report can reasonably be taken to put the case in a different light so as to undermine confidence in the jury verdict. The majority first points to an inconsistency between Abro's trial testimony and his statement in the 2013 report regarding why Kr was not taken to Care House. This information could certainly have provided defendant with impeachment material, but the majority does not explain the significance of this material. The only significance of taking Kr to Care House was that she would have been

---

[2] I find the majority's extensive discussion about whether the trial court possessed the 2010 CPS report to be unnecessary given its conclusion that the government is held responsible for CPS reports, regardless of whether their existence was known to the prosecution. Moreover, this discussion is made even more unnecessary given the lack of clarity in the record. While the record supports that that trial court *should have* reviewed the 2010 report, the trial court never explicitly stated that it reviewed the 2010 report, and the record is anything but clear as to which report the trial court actually possessed. In fact, the record is so unclear that, at oral arguments before any party was aware that the 2010 report actually existed, defendant's appellate counsel admitted that it was unclear which report the trial court reviewed at trial, and she went on to state that she suspected that there was no 2010 report. After the 2010 report was discovered, defendant's appellate counsel changed her position and asserted in a motion that "[i]t is clear *from the record* that both the prosecutor and the trial court had the 2010 CPS report." (Emphasis added). Furthermore, the majority seems to take a contradictory position by crediting an "untainted" statement made by the prosecution before the 2010 report was discovered, while ignoring one made by defendant.

forensically interviewed, and defense counsel already emphasized at trial that Abro did not have Kr forensically interviewed and instead chose to conduct his own interview. While any impeachment evidence may affect a witness's credibility, this impeachment evidence would have done so only minimally at best. More importantly, Abro's testimony itself was largely inconsequential to the allegations in this case, and the majority does not contend otherwise. Further, the fact pointed to by the majority that Abro did not want a forensic interview conducted in Texas was in the Texas CPS report that was provided to defendant, so defendant already had this information at trial.[3]

The majority also identifies an inconsistency between Kr's trial testimony and information from the 2013 report: Kr testified "that the assaults occurred at night while everyone was sleeping, but she told Abro [in the 2013 report] that they occurred while her mother was at work." Again, while the majority is correct that this would have provided defendant with impeachment material, defense counsel already extensively impeached Kr with prior inconsistent statements at trial, including numerous inconsistent statements from her interview with Abro. Defense counsel also discussed those inconsistencies at length with Abro during his testimony. This impeachment material would have, at best, minimally impacted Kr's credibility.

Lastly, the majority points to an excerpt from the 2013 report where the CPS worker detailed how Ka contacted the family that Kr was staying with in Texas so frequently that the family was "considering getting a PPO against Ka."[4] I am puzzled how this information in any way "suggests that Ka harbored a bias against defendant." This writer finds the excerpt quoted by the majority to be immaterial. In sum, from the 23 page 2013 report, the majority only points to two inconsequential pieces of impeachment evidence, which do not, in any conceivable way, undermine confidence in the jury verdict.

Turning to the 2010 CPS report, contrary to the majority's conclusion, the report does not undermine confidence in the jury verdict because information in the report is cumulative to the information presented at trial. The majority points out that the 2010 report indicated that the victim did not disclose that she was being sexually abused during an interview with a CPS worker in 2010. However, *all* of the witnesses testified that the victim never disclosed to anyone any information regarding sexual abuse in 2010. This was a delayed disclosure case. The victim alleged that the abuse began when she was eight or nine and continued until she was 12 years old, and she admitted that she never told anyone. Further, Ka testified that she reached out to CPS in 2010 to report her suspicions and that nothing came out of her complaint; defense counsel used this to his advantage during closing arguments by repeatedly emphasizing that there

---

[3] As the majority acknowledges, the statement in the 2013 report that "Kr was forensically interviewed in [Michigan]" was apparently not true. Kr was only interviewed by Abro in 2013. The Texas CPS report, which defense counsel possessed at trial, accurately reflected this.

[4] In the 2013 report, it reflects that Laura Daugherty explained to the CPS worker that Ka was contacting her husband on his work phone, that her husband was required to answer those calls, and that doing so placed her husband in a "dangerous situation due to his job as an officer," which led them to consider the PPO.

was a 2010 CPS complaint made regarding defendant and that, because nothing came from it, defendant was vindicated. Thus, the fact that the victim did not disclose defendant's sexual abuse to a CPS worker who questioned her about defendant in 2010 is consistent with the testimony at trial that she did not disclose the abuse to anybody in 2010,[5] and defense counsel already placed before the jury the fact that nothing came out of the 2010 CPS complaint.

The majority also points to the fact that, in the 2010 CPS report, "Kr denied that there was 'anything she did not like' about defendant." However, the victim testified at trial that she did not like defendant but acted like nothing was wrong, and continued to act like nothing was wrong after her family moved in with defendant. The fact that she told the CPS worker in 2010 that she liked defendant is consistent with this testimony.[6]

The majority also asserts that "[t]he results of Kr's 2010 forensic interview contradicted Kr's trial testimony." However, based on my review of the report, nothing in the 2010 report supports the majority's assertion.[7] Everything from the 2010 report corroborates Kr's trial testimony. The majority does not cite a single example to support its assertion that the report contradicted Kr's testimony. I strongly disagree with the majority's conclusion that a *Brady* violation exists where there is not a single contradictory statement in the suppressed evidence,

---

[5] I am puzzled by the majority's summation of my argument; it states that I would hold "that the CPS reports were immaterial [because] Kr's denials of sexual contact during the forensic exam were consistent with her testimony that fear of defendant kept her from disclosing the abuse." This is not my argument. Rather, in my opinion, the 2010 CPS report is consistent with Kr's testimony that she never disclosed sexual abuse to anyone in 2010, regardless of her reason for not doing so. In fact, I can find no information in the 2010 CPS report that is inconsistent with Kr's testimony, and, if these inconsistencies exist, the majority does not raise them in its opinion.

[6] In its materiality analysis, the majority states that the 2010 report "would not have been used . . . merely to impeach Ka or Kr." The majority never specifies how, or even whether, the 2010 report was material with respect to Ka's testimony. Presumably, the majority is referring to its earlier statement that the 2010 report "exposed bias on the part of Ka that could have been used by the defense during Ka's cross-examination," and this was material because the "case hinged on Kr's credibility, bolstered by Ka's testimony." If this is part of the majority's reasoning for why the 2010 report is material, it completely ignores the fact that Ka testified at trial that she did not like being around defendant and that she "would get into arguments" with him. More poignantly, the majority ignores that, during closing arguments, defense counsel repeatedly emphasized *that Ka did not like defendant*. Thus, Ka's "bias" was clearly already before the jury. The majority points to no statements from the 2010 report that contradicted Ka's trial testimony, and any exculpatory statement from Kr about Ka in the report was cumulative to the evidence already before the jury.

[7] In relevant part, the 2010 report found that "there is not a preponderance of evidence that there has been . . . sexual abuse in the home." Simply put, the 2010 report reflects that the forensic interview and accompanying investigation did not reveal any signs of sexual abuse. This in no way "contradicts" Kr's trial testimony that the abuse was occurring but she did not tell anyone.

-4-

see, e.g., *Kyles*, 514 US at 442-443 (finding a *Brady* violation when the government suppressed statements made by two key witnesses to police immediately after the crime that were "vastly different" from their trial testimony and tended to exculpate the defendant), especially in light of the other evidence against defendant, as will be explained, see, e.g., *Strickler*, 527 US at 293-294 (finding no *Brady* violation where evidence was suppressed that could have been used to "severely impeach[]" the "eyewitness testimony" that "provided the only disinterested, narrative account of what transpired" because, due to the other evidence against defendant, the suppressed material did not cast the case in a different light).

I disagree with the majority's assertion that "the evidence against defendant was far from overwhelming." The victim provided ample testimony of defendant's guilt. While this testimony rested on her credibility, defense counsel used police reports and preliminary exam testimony to impeach the victim on many small details, sufficiently bringing Kr's credibility before the jury. The majority also ignores the other evidence of defendant's guilt. Defendant's guilt was evidenced by his actions towards the Dunns to prevent Margaret from testifying against him following Margaret's disclosure to CPS,[8] and by defendant's proposals to Marrow to pay him to prevent witnesses from testifying against defendant. Further, and importantly, the majority ignores the victim's mother's testimony of three corroborating events she had knowledge of, which both gave credibility to Kr and evidenced defendant's guilt.

The majority focuses its materiality analysis of the 2010 report on the fact that, unlike Kr's nondisclosure to everyone else in 2010, the nondisclosure in the 2010 report occurred during a forensic interview. The majority reasons that

> armed with the report, defendant likely would have called the CPS forensic examiner to educate the jury regarding the techniques routinely employed to elicit truthful information in similar circumstances. Alternatively, defendant would have called his own expert witness to present this testimony. In either event, defendant could have used the CPS reports to develop a defense strategy focusing on the general accuracy and reliability of forensic interviews and interviewing techniques.

However, this reasoning for finding a *Brady* violation "is based on mere speculation, in violation of the standards" established by the United States Supreme Court. *Wood v Bartholomew*, 516 US 1, 6; 116 S Ct 7; 133 L Ed 2d 1 (1995). Moreover, I do not understand how defense counsel could have developed a new "defense" based on the forensic interview results; were defense counsel to "focus[] on the general accuracy and reliability of forensic interviews and forensic-interviewing techniques," all that defense counsel would do is bring Kr's credibility into

---

[8] During the *Ginther* hearing, defendant's trial counsel did not agree that this case was based solely on Kr's credibility due to the fact that defendant "threatened the Dunns." According to defendant's trial counsel, the Dunns's testimony showed that defendant "was volatile, he lashed out, he was uncontrollable, he was irrational and he's making threats and talking about millions of dollars." The majority completely ignores defendant's actions that evidence his guilt after he was charged in this case.

question, which was the defense already used at trial. Thus, the strategy speculated at by the majority is "consistent with [defendant's] preestablished defense" and does not support that a new trial is warranted. *Id*. at 6-7.

Moreover, I am not in agreement with the majority's conclusion, unsupported by any caselaw, that withholding the results of an exculpatory forensic interview, without any other exculpatory evidence, constitutes a *Brady* violation. Without a doubt, Kr's "testimony was prejudicial in the sense that it made [defendant's] conviction more likely than if she had not testified, and discrediting her testimony might have changed the outcome of the trial," but this "is not the standard that [defendant] must satisfy in order to obtain relief." *Strickler*, 527 US at 289. And I certainly agree that, had the 2010 report been disclosed, "there is a reasonable *possibility*" that a different result would have produced; however, again, this is not the correct standard. *Id*. at 291. The proper standard for determining whether defendant is entitled to a new trial based on the withholding of exculpatory evidence is whether there is a "reasonable *probability* of a different result," which is simply not present in this case. *Id*.

While I do not intend to in any way detract from the importance of forensic interviews, there is no consensus regarding the efficacy of forensic interviews, even when properly conducted,[9] and I do not believe that defendant is entitled to a new trial in this case solely

---

[9] For example, in one study of the disclosure process of sexually abused children, "nearly eighty percent of the children denied their abuse or were tentative about disclosing" during "early therapy interviews." Myers, Saywitz & Goodman, *Psychological research on children as witnesses: Practical implications for forensic interviews and courtroom testimony*, 28 Pac L J 3, 45 (1996-1997), citing Sorensen & Snow, *How Children Tell: The Process of Disclosure in Child Sexual Abuse*, 70 Child Welfare 3, 11 (1991). In another study, 28 children with sexually transmitted diseases "were interviewed by a social worker who was 'trained in abuse disclosure techniques,' " and "[o]nly forty-three percent of the children 'made a verbal disclosure of sexual abuse in the initial interview.' " *Psychological research on children as witnesses*, 28 Pac L J at 46, quoting Lawson & Chaffin, *False Negatives in Sexual Abuse Disclosure Interviews: Incidence and Influence of Caretaker's Belief in Abuse Cases of Accidental Abuse Discovery by Diagnosis of STD*, 7 J. Interpersonal Violence 532 (1992). That same study provided the following:

> Surveys of adult survivors indicate that they rarely reported sexual abuse when they were children, and the child abuse field has continued to struggle with questions regarding "hidden victims." The present findings provide additional reason to be concerned about underidentification of sexual abuse in the current generation of young child victims. Even when directly interviewed by a trained specialist who was sure the child had been molested, the majority of these . . . victims did not make even minimal disclosure . . . . [*False Negatives in Sexual Abuse Disclosure Interviews*, 7 J. Interpersonal Violence at 536.]

By presenting these studies, I am not attempting to undermine forensic interviewing or the methodologies behind it, but rather am merely illustrating why we should consider what

because the results of a forensic interview were part of the 2010 report. To bolster its reasoning that the inclusion of the forensic interview in the 2010 report undermines its confidence in the jury's verdict, the majority cites to two excepts from the introduction of the Michigan Governor's Task Force on Forensic Interview Protocol; an excerpt from the introduction of the American Professional Society on the Abuse of Children practice guide to forensic interviewing children suspected of child abuse; and a sentence from the overview section of Child Welfare Information Gateway's factsheet on forensic interviewing. All of these quotes from the introduction sections of their respective sources relate to the goals of forensic interviewing. While these goals are laudable, they are only goals. The majority provides no caselaw, nor any other authority, to support its assertion that forensic interviews are the best "potential source of evidence . . . pertinent to whether [a victim's] allegations should [be] believed."

Rather than focusing *solely* on the goals and principles of forensic interviewing and forensic interviewing techniques, I believe that the proper approach in determining the 2010 report's materiality is to consider what actual information from the 2010 report would have been placed before the jury. There is nothing in the 2010 report that contradicts what was already before the jury. The 2010 report contained information that Kr stated that Ka did not like defendant, that Kr stated that she liked defendant, and that Kr did not disclose any sexual abuse in 2010 during an interview with a CPS worker. At trial, Ka admitted that she did not like defendant, Kr stated that she acted as though she liked defendant, all witnesses testified that Kr did not disclose any sexual assault to anyone in 2010, and defense counsel argued during closing that a complaint with CPS was filed against defendant in 2010 and nothing came from it.

This, taken together with the minor impeachment material from the 2013 report, is not sufficient to undermine my confidence in the verdict in light of the other evidence: Kr presented ample evidence of defendant's guilt and her credibility was already sufficiently brought before the jury; Kr's mother provided three corroborating incidents that gave credibility to Kr and evidenced defendant's guilt; and defendant's guilt was evidenced by his actions towards the Dunns to prevent Margaret from testifying and his proposals to Marrow to pay him to prevent witnesses from testifying. Because the information in the 2010 CPS report was already before the jury, the evidence in the 2013 report provided only minor impeachment material, and in light of the other evidence in this case, there is not a reasonable probability that the result of trial would have been different had the suppressed documents been disclosed to defendant.

Because I would leave untouched the jury's verdict in this case, I respectfully dissent to the majority's finding of a *Brady* violation.

/s/ Colleen A. O'Brien

---

substantive information was contained in the 2010 report rather than focusing solely on the forensic interview.